Louis P. Paquet, a pedestrian, was almost instantly killed at about 8:45 a.m. on October 19, 1944, while crossing Metairie Road at or near the junction of Fairway Drive, when he came into contact with an automobile owned by Mr. and Mrs. Paul Renken and driven by Mrs. Renken. Surviving the deceased Paquet are his widow and a young daughter, Gwendolyn L. Paquet, who at the time was 7 years old. On her own behalf and on behalf of her minor daughter, Mrs. Paquet brought this suit against Mr. and Mrs. Renken seeking judgment against them solidarity, making Mr. Renken defendant on the allegation that at the time of the occurrence Mrs. Renken "was acting with the consent of her husband for and on behalf of the community existing between her and her husband * * * and as the agent thereof." She asks for judgment in her own behalf for $10,000 and on behalf of her minor daughter for $10,500.
The charges of negligence are that as Mrs. Renken approached the point at which Paquet was attempting to cross the road, she did not have complete control of her automobile; that she was driving it at such a rate that it could not be stopped "within the distance she could see"; that she did not apply the brakes as soon as she should have; that she did not maintain a proper look-out and that she did not stop her car as soon as she could have had she attempted to do so as soon as it became apparent that Paquet was in a position of peril.
In a supplemental petition it is alleged "in the alternative" that Paquet had completely crossed Metairie Road when the accident occurred and was standing beyond the curb on the south side of that road when he was struck by defendant's automobile.
After certain preliminary exceptions were overruled, which exceptions were not urged before us, defendants filed answer. They admit the occurrence of the accident and that Paquet was killed as a result. They admit that Mrs. Renken was acting on behalf of the community between her and her husband and as its agent, but they deny all negligence on her part and, in the alternative, that it should appear that she was in any way at fault, they allege that that fault was not the proximate cause of the accident and that said proximate cause was the contributory negligence of Paquet, himself, in leaving a place of safety on the curb on the north side of the road and stepping directly into the path of the automobile when it was too late for Mrs. Renken to avoid him; in failing to look for approaching vehicles as and just before he stepped into the road; in attempting to cross the road "at a point some distance from the corner and at a place not designated by the proper authorities as a pedestrian crossing;" in running directly into the path of the car when Mrs. Renken swerved to the left in an effort to avoid him when she saw him step into the road, and in failing to take any precautions whatever before leaving the sidewalk or after he stepped into the road.
In the Civil District Court for the Parish of Orleans there was judgment for Mrs. Paquet in her own behalf for $7,000 and on behalf of her minor daughter for $5,000.
Both defendants have appealed and Mrs. Paquet has answered the appeal praying that the amount of the judgment in her behalf be increased to $10,000 and on behalf of her minor daughter to $10,500, both as originally prayed for.
The record is a very long one and there is an irreconcilable conflict in the testimony in several particulars.
Metairie Road is a much used thorofare extending westward from the City of New Orleans into the Parish of Jefferson. The accident occurred a few hundred feet on the New Orleans side of the parish line just beyond the rear end of Metairie Cemetery and a few feet to the westward of the point at which Fairway Drive enters Metairie Road from the North. Fairway Drive does not continue across Metairie Road on the south side.
Mrs. Renken, in her automobile, was driving along Metairie Road going westward — Paquet evidently intended to cross the road going from the north to the south *Page 220 
side. About 75 or 80 feet west of Fairway Drive but on the other side of Metairie Road a private driveway enters the road and on that side (south) of Metairie Road, and almost opposite the entrance of Fairway Drive, there is a bus stop for pedestrians desiring to enter or leave busses proceeding into New Orleans from the west.
[1] Apparently Paquet was not crossing Metairie Road directly from the corner of Fairway Drive as we think that the evidence shows that he was some 30 feet or so beyond that corner and that he was going in a slightly diagonal direction, that is southwest, so that as he stepped into the road and walked across it, the rear of his left shoulder was presented towards the on-coming car of Mrs. Renken. It is obvious that he did not look as he entered the road-way because had he done so he would have seen the car and would have realized that it was dangerous to step into the road just at that moment. That he did not look and did not see the car before stepping into the road is further evidenced by the fact that after he had proceeded into the road a short distance he did look to his left and then saw the car and broke into a run.
Without finding it necessary to go into an analysis of the evidence on this point, we conclude that Paquet was guilty of negligence and that without this negligence he would not have been struck by the on-coming car.
[2, 3] But the mere proof of negligence on the part of a person, situated as Paquet was, is, under the jurisprudence of this state, no longer a defense unless it appears that that negligence took place at a time when it was no longer possible for the person operating the on-coming car to bring it to a stop before striking the pedestrian. Since the decision of the Supreme Court in Rottman v. Beverly, 183 La. 947, 165 So. 153, followed later by Jackson v. Cook, 189 La. 860, 181 So. 195 and which has since been followed in many other cases, it is now recognized that there is a doctrine sometimes called "discovered peril" and sometimes "apparent peril" under which it is held that there is liability, if the defendant either discovers the peril of such a pedestrian or, by the exercise of proper care, could have discovered it, and could have avoided an accident, even though the peril was created initially by the negligence of the pedestrian, himself. Under this doctrine, which is very much akin to the doctrine of the last clear chance, and, in fact is all off-shoot of that doctrine, it is the duty of the operator of an automobile to discover such peril and to follow that discovery by doing all that an ordinarily prudent person could have done to avoid an accident. That doctrine is now so well recognized that a further discussion of it is unnecessary.
Consequently, the sole question, so far as liability is concerned, is whether Mrs. Renken did discover or could have discovered Paquet in time to have avoided striking him, and whether, when she did discover or could have discovered his peril, could she have avoided him?
Her own story, and we think that it is quite clear and straightforward, is that as she approached the corner of Fairway Drive, Paquet was standing on the curb about 12 feet beyond or westward of the corner and that he was "just standing there" about a foot from the curb. She says that when her car was about 18 or 20 feet from him "he stepped directly in front of the car" and that she was driving at a speed of about 20 to 25 miles per hour. She says that he took 8 or 10 steps into the. street before he commenced to run. In this she is obviously incorrect because if he had taken 8 or 10 steps into the street and had then run a few steps, he would certainly have been completely across the street before the automobile struck him. If we could accept as true Mrs. Renken's statement that, while she was approaching him, Paquet took 8 or 10 steps into the street, it is obvious that she would be held guilty of negligence in failing to avoid him under the doctrine which we have already discussed.
There is much other testimony to the effect that Paquet stepped into the street when Mrs. Renken's car was still 75 or 80 feet away and that he had taken several steps while the car was approaching but that instead of stopping her car, Mrs. Renken seemed to attempt to swerve to the left in an effort to pass around him, and *Page 221 
that as she swerved to the left, Paquet noticed the car for the first time and, in his fright, started to run and only then did Mrs. Renken apply her brakes in an effort to stop.
Mr. and Mrs. Robert A. Dueease were approaching from the opposite direction in an automobile driven by Mr. Dueease. He testified that when he first noticed Paquet he was about one-third of the distance across the road and that Mrs. Renken's car was beyond Fairway Drive. This would indicate that the car was about 75 feet away from Paquet. Dueease says that Paquet was walking at a normal pace and that the automobile was on the right hand side of the road, close to the curb. He says too that just as the car approached Paquet, he "looked up and saw the car approaching him to his left and started running". He adds that when Paquet was struck, he was about three-quarters of the way across the street. That Mrs. Renken did swerve the car to the left is not disputed and the physical facts show that before stopping, the car went completely across the street and crashed into a tree on the south side some distance beyond the point at which Paquet was struck.
The testimony of Mr. Dueease is rather violently attacked by counsel for defendants who state that before the trial they thought that he was defense witness, basing their belief on a signed statement which he had given some time before, and which statement we shall hereafter discuss.
[4] Counsel also attack the testimony of Mr. Dueease on the ground that some of his statements constitute inadmissible opinion evidence which should not have been included but which was admitted over their objection. Dueease was asked certain questions as to distances within which automobiles can be stopped if running at certain speeds and objection was made that he had not qualified as an expert. He was then asked in effect whether, based on his own experience, he could have stopped a properly equipped automobile going at the speed at which Mrs. Renken's car was going and within the distance which remained to Mrs. Renken after it became apparent that Paquet was in a perilous situation. He answered: "Yes sir, I think she could have stopped." When pressed as to what he based his opinion on, he said: "The only thing I know is that I believe that I could stop my car in that distance."
In support of their contention that this evidence is inadmissible, counsel for defendants call attention to the many footnotes on page 236 of Vol. 32 of Corpus Juris Secundum, Evidence, § 533 in which footnotes are set forth many instances in which such oral evidence was held to be inadmissible in other jurisdictions. These footnotes are in connection with the text of the discussion in which it is said: "A person who is specially qualified by skill or experience may state an inference or judgment as to matters connected with the management and operation of motor vehicles if the jury cannot fairly be expected to draw accurate, or as accurate, conclusions for themselves. * * *"
Later in the same discussion appears the following: "* * * a qualified witness may state an inference or judgment as to: * * * whether a collision could have been avoided; * * *."
We have some doubt as to whether the evidence of Mr. Dueease on this question should have been admitted and if the case had been tried before a jury possibly we would have felt that admission of this testimony had had a prejudicial effect but we do not feel that that can be said here. The district judge was well qualified to reach a conclusion on these facts uninfluenced by an opinion of this witness, and we deem it relatively unimportant in view of the fact that the record is a very large one and that there is in it a vast amount of additional testimony on the questions which are involved.
The other attack made on Mr. Dueease is based on the fact that he had previously signed a written statement which was substantially different from the testimony given by him on the stand. In his testimony he said that when he first saw Paquet he was about one-third of the way across the road and that the Renken car was about 75 or 80 feet away, and was on its proper side of the road. In his signed statement he had previously said that his attention *Page 222 
was first called to Pacquet when "I heard my wife gasp and I looked up." He followed this with a statement that at that time Paquet was "starting" to cross the street and that the automobile "appeared to be swerving to its left." He said too that when Paquet reached a point about a third of the way across the road, he appeared to glance to his left, saw the car and then started to run across the street.
A study of Dueease's estimates of the speed of the Renken car — the distance Paquet had travelled from the curb when he was first seen by Dueease and the distance Paquet ran after he noticed the car shows that these estimates were mere guesses because if Paquet was one-third of the distance across the road when he was first seen and the automobile was then 75 or 80 feet away, and was approaching at a speed of about 25 miles an hour, and if Paquet then broke into a run, it is apparent that he would have completely crossed the road before the car could have struck him. Yet it is very clear that when Paquet was struck he was somewhere just beyond the center of the road. We have made a very careful study of the testimony of Dueease because of these inconsistencies between his testimony on the stand and his written statement, and have reached the conclusion that, because of the suddenness of the occurrence, the facts failed to register themselves accurately in his mind but that on both occasions he attempted to state the facts exactly as he remembered them. His evidence as a whole indicates that Paquet had been in the roadway for some time before he was struck by the Renken car.
As to the application of the brakes, Mrs. Renken, herself, intimates that she made no effort to apply them until just before the collision. At one point she was asked the question: "When you struck him, he was still running?" She answered: "I immediately put on the brakes."
A witness who gave testimony very favorable to defendants was Camille Green, a colored domestic who worked in a residence nearby. She was on her way to work. She says that she "didn't particularly notice this car until he stepped right down in front of it." When asked how far away the car was at the time, she pointed out a distance which, when measured, proved to be 15 feet. She said that the car was not going "very fast" and added, "I know she wasn't speeding."
[5, 6] Several other witnesses gave testimony more or less favorable to plaintiffs. If we had not before us the finding of the District Court judge who saw and heard most of the witnesses (two testified under commission) we would find difficulty in reaching the conclusion that Mrs. Renken was at fault. But when we read the entire record we conclude that the District Judge was not manifestly in error in holding that Mrs. Renken should have avoided the accident. Not only is there testimony, which if true would show liability, but there are physical facts which lend color to the theory of plaintiffs. The automobile in question swerved to its left and unquestionably crashed into a tree on the left side of the road at some distance beyond the point of impact. In this kind of case we must follow the well recognized rule that the trial judge is better able than are we to arrive at a correct finding on the facts.
[7] The facts that the Renken car had no brake tag to show that it had passed the inspection required by ordinances of the City of New Orleans, and that Mrs. Renken had no driver's license, also as provided by ordinances of the City of New Orleans, are of no consequence. It is shown that Mr. and Mrs. Renken were residents on the Parish of Ascension, and therefore were not required by the ordinances of New Orleans to have their car inspected by New Orleans inspectors nor to have drivers' licenses issued in the City of New Orleans. There is no contradiction of the testimony that no such inspections and no such licenses were required by the authorities of the Parish of Ascension. However, although no such brake inspection was required by the parish of their domicile, it would have been negligence for them to have permitted the car to be operated with defective brakes. But the evidence shows that immediately after the accident the car was inspected by the Police Brake Inspector of the City of New Orleans *Page 223 
and that he found that the brakes and the steering apparatus were in good condition.
[8] In passing we think it advisable to state that with regard to speed it is charged that Mrs. Renken was at fault in that she was exceeding the limit fixed in the traffic ordinance of the City of New Orleans, No. 13702 C.C.S. Her own statement is that she was driving "between twenty and twenty-five miles an hour." Counsel for plaintiffs contend that in that locality the limit fixed in the City Ordinance is 20 miles per hour and they point to Article V, Section 3 of the Ordinance by which "* * * in a residental district and in public parks * * *" the speed limit is fixed at 20 miles per hour. Counsel for defendants counter with the argument that this was not a residential district and they point to the definition of a residential district, which in Article I of the ordinance is set forth as follows: "Residence District. Any street length between street intersections where more than fifty per cent of the frontage is in use for residence purposes." They point out that at the point at which the accident occurred most of the adjacent property was not used for residential purposes. Counsel for plaintiffs seek to meet this by the argument that if it was not a residential district at least there were public parks nearby. But the ordinance does not provide that in the "neighborhood" of public parks the speed, limit shall be 20 miles per hour. Where public parks are involved that limit is fixed only for vehicles operating "in" the park.
We think that the record shows that only a small part of the actual frontage on Metairie Road at that point is used for residential purposes and that the road is not within a public park, and that the 20 mile limit contended for by plaintiffs had no application.
In spite of this conclusion, however, we are of the opinion, already expressed, that the finding of the judge a quo is not manifestly erroneous.
Counsel for defendants strenuously argue that the law applicable is favorable to the defendants and they cite many cases which they say result from facts similar to those found here. They direct attention particularly to the case of Hebert v. Meibaum, 209 La. 156, 24 So.2d 297. But there although the plaintiff had been in the street for some time and could, no doubt, have been seen by the defendant long before the car driven by defendant reached the point at which the accident occurred, there was nothing about the appearance of the plaintiff to give notice of the fact that, at the last moment, he intended to move forward into the path of the oncoming car. The Supreme Court said that as the defendant approached, the plaintiff and another man continued to stand alongside the parked automobile "in a position of safety" and that the defendant "continued to see and observe these parties, and there was nothing in their manner or movements to indicate that either one of them had any intention of crossing the street in the path of his approaching automobile. * * *"
We are necessarily quite familiar with the facts of that case since we first decided it in favor of plaintiff and then, after granting a rehearing, decided, by a divided court, in favor of defendant. See La. App., 17 So.2d 750 and La. App.,19 So.2d 629.
Here the plaintiff had stepped into the street and had taken several steps when the automobile of defendants was still a considerable distance away.
Of course, there is no doubt that where the pedestrian steps into the street immediately in front of an approaching car and when there is not sufficient time for it to be stopped there is no liability. But under the doctrine of the cases to which we have already several times referred, when the pedestrian places himself in a position of peril when there is still time for the driver of an approaching automobile to avoid him, it is the duty of the driver to do so.
Counsel for defendants places much reliance on the statements made by the Court of Appeal for the First Circuit in Bailey v. Reggie et al., La. App., 22 So.2d 698, 704. But the facts there were quite different for there the court distinguished between that case and the doctrine of Rottman v. Beverly and Jackson v. Cook and said: * * *
"These two cases however are distinguishable from the present as in both the position *Page 224 
of the victim of the accident on the highway was either readily apparent to the driver of the offending car or, as it was held, he should have seen them and realized their perils in time to stop or avoid striking them."
In the case at bar, instead of attempting to stop as we find that she could have done, Mrs. Renken did not apply her brakes but made an effort to swerve around Paquet. This was the proximate cause of the unfortunate accident. She had the last clear chance to avoid it — she did not do so. The doctrine of discovered or apparent peril is applicable.
We approach the problem of fixing the amounts which the widow and daughter should be awarded with a realization of the fact that awards in Louisiana have been, with rare exceptions, far below those made in other jurisdictions. We must necessarily be guided by former awards approved by our Supreme Court rather than by those approved elsewhere. We realize that seldom may awards in other cases be adopted as standards for fixing the awards in cases under consideration but we find in Browne v. Texas Pacific Ry. Co., La. App., 193 So. 511, a case in which the facts which controlled the award are so remarkably similar to those here that we think it serves especially well as a standard for the case at bar. There the death of the husband and father was instantaneous so that there was no allowance for his inherited claim for suffering prior to his death. That is also true here. The widow was allowed $7,000 which was exactly the amount awarded to the widow here. The daughter was given judgment for $5,000, which was also the amount of the judgment in favor of the daughter in the case at bar. There are slight differences, however, which seem to justify an increase in each of the awards in the instant case. In the Browne case the deceased was 61 years of age, whereas Paquet was 9 years younger, or 52. The income of Browne in the year prior to his death had been $4,000 whereas that of Paquet had been $7,270. According to Paquet's widow, and her testimony is not contradicted, he had earned at least $5,000 per year for 20 years.
The American Experience Table of Mortality, by Act No. 127 of 1921, Ex.Sess., has been adopted in Louisiana "In fixing the value of any legacy or donation mortis causa which consists in whole or in part of an annuity or usufruct or right of use or habitation, * * *". Section 23. According to that table Browne had a life expectancy of 13.49 years whereas Paquet had a life expectancy of 19.49.
Another difference between the two cases lies in the fact that the minor daughter of Browne was 16 years of age, whereas the daughter of Paquet was only 7 years of age.
Furthermore, the decision in the Browne case was rendered in 1939 before the phenomenal rise in the cost of living and the considerable depreciation in the value of the dollar. Therefore, an award made at this time must necessarily be more than an award made in 1939 to produce the same result in the purchasing power of the amount awarded. This situation has often been recognized, the latest decision we have found on the subject being that rendered by our brothers of the Second Circuit in Richey et al. v. Service Dry Cleaners et al., La. App., 28 So.2d 284, 286, in which they said: "To determine a proper award of damages in this case, as so often happens, is not without difficulty. The award of the lower court if made a few years ago in a case of this character, would have been adequate. It is not so under present economic conditions. The purchasing power of American money is far below what it was five years ago, and all signs support the belief that many years will have to elapse before improvement in this connection will be measurably attained. We had occasion to touch upon this subject in Scott v. Claiborne Electric Cooperative, Inc., et al., La. App. 13 So.2d 524 and in Weadock et al. v. Eagle Indemnity Co. et al., La. App. 15 So.2d 132."
[9] We now revert to the question of the life expectancy of the deceased because counsel for the defendants seem to question whether the table referred to may be made use of in a suit for damages. Possibly they are correct. We find, however, *Page 225 
that in the Browne case the Supreme Court referred to the life expectancy of the decedent and stated that he was 61 years of age. Surely we can use that statement as a foundation for our own statement that if the life expectancy of Browne at 61 years was the figure given by the Supreme Court, the life expectancy of Paquet at 52 would be greater. In viewing the two cases together we cannot but reach the conclusion that the awards made below in the instant case are inadequate and have concluded to increase the award of the widow to $9,000 and that in favor of the minor daughter to $7,500.
Accordingly, it is ordered, adjudged and decreed that the judgment appealed from be and it is amended by increasing the amount of the award in favor of Mrs. Paquet to $9,000 and that in favor of Mrs. Paquet for the use and benefit of the minor child, Gwendolyn L. Paquet, to $7,500, with legal interest from judicial demand, defendants-appellants to pay all costs.
Judgment amended and affirmed.