This suit is the outgrowth of an intersectional accident, in broad daylight, between the Plymouth automobile of the plaintiff and a taxicab of the defendant, Service Cab Company, a copartnership. Plaintiff was driving his car westerly on a parish highway, commonly called the Penal Farm Road. The taxicab was being driven southerly on State Highway No. 559, called the Dubberly Road, by one Delma Taylor, agent and employee of the partnership. The collision occurred about six miles south of Minden in Webster Parish, Louisiana, where the two roads cross.
Plaintiff seeks judgment against said partnership and its members, B.B. and W.G. Barnette, and the carrier of its public liability insurance, the Great American Indemnity Company, for the damages sustained by him consequent to the accident. It is alleged by the plaintiff that before attempting to cross the intersection he brought his car to a stop on the east side thereof and looked in each direction to ascertain traffic conditions on the Dubberly Road and did not see a single vehicle thereon; that he then put his car in gear and proceeded forward slowly and when he had passed the center of the intersection his car was violently run into by the taxicab on its right hand side.
For a cause of action against the defendants, plaintiff alleged that the collision happened solely by and through the negligence and carelessness of the taxi driver in these respects, to wit:
(a) Driving at a speed in excess of 60 miles per hour, on a country road, when near an intersection;
(b) Not maintaining a proper lookout for traffic and not having his car under complete control as he approached the intersection; *Page 551 
(c) Driving the taxicab in such a careless and reckless manner as to endanger the lives not only of his own passengers, but of others using the highway in a lawful and prudent manner.
Defendants deny that the collision was to any extent due to the negligence of the taxi driver, and aver that while going at a speed of not over 45 miles per hour, plaintiff's car suddenly and without warning entered the intersection directly in front of the taxicab without there being time or distance sufficient to stop before colliding with it, although every effort was put forth to do so; that the two vehicles entered the intersection about the same time and the taxicab being to plaintiff's right, had the right of way, which plaintiff failed to recognize; that plaintiff should have brought his car to a stop before crossing the intersection and then looked to ascertain if it were safe to do so, and had he followed this rule of caution, he would have observed the taxi to his right and would have concluded it was not safe for him to proceed until it had passed.
In the alternative, employing the above related alleged acts of negligence on plaintiff's part as a basis therefor, defendants invoke his contributory negligence as a bar to his recovery. Defendants also plead that plaintiff had the last clear chance to avoid the accident and did not avail himself of it.
Plaintiff's demand was rejected and his suit was dismissed at his cost. He appealed to this court.
The record makes it clear that plaintiff either brought his car to a stop, or reduced its speed to such degree before attempting to cross the intersection, that he could have stopped instantly. He testified that he did stop and there is no evidence in the record to the contrary. He was going at a very slow speed when first observed by defendant's driver and the two lady passengers in the taxi. The taxi driver says that plaintiff was traveling at from 5 to 10 miles per hour when he first observed him in the intersection.
Plaintiff is positive that after stopping at the edge of the intersection he looked in both directions for cars on the Dubberly Road and saw none. He then proceeded forward and was struck when about the center of the 24 foot intersection or when slightly west of the center. He testified that his eyesight was good and that he could and did see .3 of a mile to his right. However, he did not see the taxi until it was not over 40 feet from him.
It is also established beyond any reasonable doubt that the taxi was traveling at a speed not less than 60 miles per hour. The driver admits a speed of 55 miles per hour. The two lady passengers estimated the speed at from 60 to 65 miles per hour. It was so excessive that they felt uneasy and one of them protested to the driver who slowed down some for awhile, but soon resumed his former speed. The excessive speed of the taxi is well reflected from the fact that after application of the brakes it traveled 60 feet. Skid marks in the gravel surface covered this distance.
The taxi was covering 88 feet per second. Plaintiff's car was making not over 10 feet per second. It required but three seconds for the taxi to reach the intersection after plaintiff was seen by the lady passengers therein. It is fair to assume, as we do, that it required about the same time for plaintiff to go from stop to that point in the intersection where struck.
The two lady passengers saw plaintiff's car first when the taxi rounded a slight curve 280 feet north of the intersection, but the taxi driver testified he first saw it when only 80 or 90 feet away. The correctness of this estimate is confirmed by the length of the skid marks which were made after the brakes were applied. There existed no good or valid reason why the taxi driver did not observe plaintiff slowly entering the intersection when the two ladies did. Had he done so and immediately applied his brakes, the collision would have been averted. He could have, by so doing, brought his vehicle to a stop before reaching the intersection.
The fact that plaintiff did not see the taxi when he stopped and looked each way when at the edge of the intersection, in view of uncontradicted facts of the case, becomes unimportant and surely is not a decisive factor therein. It is certain the taxi was at least 285 feet from plaintiff *Page 552 
when he entered the intersection. Suppose he had seen the taxi when that far away; would he not have had the right to assume that it was traveling at a lawful rate of speed and that he had ample time to negotiate the intersection before the taxi would reach it? Surely so. Had the taxi been going at a lawful speed plaintiff would have gotten over the intersection without mishap.
[1, 2] It may be said that under rule 11 (a) of the Highway Regulatory Act, No. 286 of 1938, primarily the taxi driver had the right of way, but under other provisions of this same rule he forfeited that superior right by illegal, dangerous and reckless speed. By driving at a rate in excess of 50 miles per hour, the taxi driver violated Section 3, subsection (c) 3 of Rule No. 4 of said Highway Regulatory Act; and rule No. 4(a) of the Act provides that a motorist who drives his car upon a highway of this state at such speed and in such manner as to endanger the life, limbs or property of others: "shall be held and deemed to be prima facie at fault in and responsible for any accident or damage proximately flowing therefrom or connected therewith, which presumption, however, may be rebutted and overcome by proper showing of the contrary."
The facts prove that the taxi driver was violating this rule of the road prior to and at time of the collision.
[3] The violation of a traffic law is per se negligence, and when it is the proximate cause of an accident, as is true in this case, the violator becomes responsible for the injurious results of it.
[4] It is clear to us that plaintiff was free of negligence in attempting to cross the intersection. But, even though it be conceded, arguendo, that he was to some extent negligent in doing so, defendant would still be liable to him for the damage he sustained.
[5, 6] The undisputed facts of the case, conceding that plaintiff was negligent to some extent, warrant application of the doctrine of the last clear chance or discovered peril. Even though the taxi driver did not see plaintiff in a perilous situation in time to avert running into him, the rule of law comprehended in said doctrine (now well established in this state) has the same application as though he had seen him and had failed to avail himself of the last clear chance not to injure him. A motorist is held to have seen that which by the exercise of due diligence he could have seen.
The lower court held that both motorists were negligent and stated in written reasons for judgment that by the exercise of ordinary care on the part of each, the accident would not have occurred. The court cites and quotes from a recent decision of this court, Wyche v. Brian, 28 So.2d 143, wherein Judge Hardy was the court's organ, to support the judgment rendered by it. The crux of that case simply recognizes and applies the legal principle that in the eyes of the law a motorist must be held to the duty of seeing what he should have seen. No fault can be found with such a holding, and we are applying it in this case. Of course, the facts of the Wyche case are quite different from those of the present case. The last clear chance doctrine had no application to those facts, as regards either motorist.
The question here discussed has been tendered in numerous cases arising in this state. The fairly recent case of Jackson v. Cook, 189 La. 860, 181 So. 195, deals elaborately with the question, and clearly states the conditions necessary to exist to render the doctrine applicable. This is reflected clearly from paragraphs one and two of the syllabus, which we here quote:
"The duty of those in charge of automobiles to look ahead and observe never ceases, and in legal contemplation what they can see they do see, and the failure to see that which could have been seen by the exercise of due diligence does not absolve the motorist from liability.
"Where the motorist sees a person in peril of which such person is not aware, duty devolves upon the motorist to use every possible available means to avert injury, notwithstanding negligence of such person, and if motorist fails to perform such duty the last clear chance doctrine applies, even though person's negligence continues up to the accident." *Page 553 
See also Taylor v. Shreveport Yellow Cabs, Inc., et al., La. App., 163 So. 737, in which the Supreme Court refused writ of review.
Plaintiff was nearly 67 years old when injured. He was a retired railroad employee and was drawing a monthly pension. He retired from railroad service on August 31, 1945, and had not since that time followed a gainful occupation or business. Prior to the accident his general health had been good.
Plaintiff's car was knocked southeasterly about 30 feet, but it did not turn over. He was rendered semi-conscious from concussion of the brain, slumped over the steering wheel and remained in that position until his son, about one hour thereafter, arrived and carried him to a sanitarium in Minden. He was there placed in charge of Dr. B.L. Cook for examination and treatment. X-ray pictures disclosed no fractures or broken bones. He was then in a state of mental and physical shock and talked incoherently. He suffered lapse of memory which persisted for about a week. The doctor found considerable bruises and contusions on the right arm, shoulder and hip. There were no wounds about the head but evidently to produce the concussion it must have violently struck some part of the car at the time of the impact.
Plaintiff remained in the doctor's office for only an hour and was then carried home but the doctor continued to treat him for lumbosacral sprain. He was confined to bed for a time. No doubt the violent contact of his body against the interior of the car brought about extensive soreness of the flesh, muscles, etc., accompanied by pain and much discomfort for some weeks.
According to plaintiff's testimony he had not fully recovered from the effects of his injuries at time of trial, 11 months after the accident. He attributes all of his aches, minor pains and discomfort to the accident.
Plaintiff was also examined by Dr. W.S. Harmon of Shreveport, Louisiana, on February 4th, eight months after he was hurt. Dr. Harmon found his general condition very good for one of his age and also found some limitation of motion of the lower back, about which plaintiff complained mostly. The arms, shoulders and legs were functioning normally. It was Dr. Harmon's opinion that the chronic osteo-arthritis was producing the pain of which plaintiff complained and the impaired movement of the spine. He admits that trauma can and ofttimes does aggravate pre-existing arthritis.
We conclude from a careful consideration of all the testimony bearing thereon that at date of trial plaintiff had practically recovered from the ill effects of the accident and in view of his age and the chronic arthritis with which he is afflicted, was enjoying about as fair physical condition as might be expected. He is able to engage in light work. His age, regardless of the accident, would limit him to this character of work.
[7] Plaintiff sued for loss of earnings in addition to other damages sustained by him. As said before, he was not working when injured. He testified that he intended to go to work on June 15th, 12 days after the accident, at a salary of $200 per month, but he did not give the character of the duties this job would require of him. Anyway, the proof with respect to loss of earnings is not of such character as to warrant judgment in his favor.
Plaintiff is entitled to recover:
Cost of repairing his car $503.49 Physicians' bills 70.00 Sanitarium bill 30.00 Pain, suffering and discomfort 2,000.00 --------- Total $2,603.49
For the reasons herein assigned, the judgment appealed from is annulled, avoided and reversed, and there is now judgment in favor of plaintiff, Henry J. Hanson, Sr., and against the defendants, Service Cab Company, and its component members, B.B. Barnette and W.S. Barnette, and their insurer, Great American Indemnity Company, in solido, for the sum of $2,603.49, together with legal interest thereon from judicial demand until paid, and for all costs of suit.
KENNON, J., absent. *Page 554