240 F.2d 899
 The GREYHOUND CORPORATION, Appellant,
v.
Mrs. Elizabeth DEWEY, wife of George Dewey and George Dewey,
Individually and as Administrator of the Estate of
George W. Dewey, Deceased, Appellees.
 No. 16141.
 United States Court of Appeals Fifth Circuit.
 Jan. 31, 1957.
 
 F. Carter Johnson, Jr., Porteous & Johnson, New Orleans, La., for appellant.
 Gerald J. Gallinghouse, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, for appellees.
 Before BORAH, TUTTLE and CAMERON, Circuit Judges.
 CAMERON, Circuit Judge.
 
 
 1
 Appellees brought this action for the wrongful death of their son, George W. Dewey, who was struck and killed by a bus owned and operated by appellant. Upon a jury verdict, judgment was entered in favor of appellees for $30,704.00.[1] Appellant contends on this appeal that the evidence was insufficient to establish that its driver was negligent, that deceased was guilty of contributory negligence as a matter of law precluding recovery under Louisiana authorities, and that the Court erred in submitting the question of last clear chance to the jury.[2]
 
 
 2
 The accident in which appellees' twenty-two year old son was killed occurred about one P.M. December 7, 1952, as the deceased and three companions were walking in pairs in a northerly direction along the east shoulder of United States Highway 61 as it ran by the Moisant Airport in Kenner, Louisiana. The highway at the point had four lanes, was straight and level with an overall width of forty-one feet six inches, each lane having a width of 124 1/2 inches. On each side was a firm shell-covered shoulder nine to ten feet wide and ranging from one to two inches lower than the paved road. The shoulders constituted the only place for pedestrians to walk, there being no sidewalks near the point.
 
 
 3
 Appellant's bus, proceeding in a northerly direction in the outside lane, approached this group from the rear. As it came abreast of Dewey and his companions a locknut attached to the bottom of the right rear-view mirror, which projected beyond the side of the bus, struck Dewey on his left temple, knocking him down, crushing his skull and rendering him unconscious. His death came six days later. The evidence was undisputed that Dewey was at all times upon the shoulder of the highway.
 
 
 4
 The evidence showed that the bus was ninety-two inches wide between the outer edges of the front tires, which tires had a thread width of eight inches; the right locknut was five feet seven inches from the surface of the pavement[3] and projected four and one-half inches beyond the body of the bus. The overall width between right and left locknuts was 100 1/2 inches, and the mirrors projected outward beyond the locknuts an additional one to two inches, making the extreme width of the bus from mirror to mirror 102 1/2-104 1/2 inches.
 
 
 5
 Relying on the provisions of the Highway Regulatory Act[4] that pedestrians are 'prima facie responsible for any consequence' of failure to 'walk on their lefthand side of the highway as near as possible to the edge thereof,' appellant contends that, as a matter of law, the deceased was guilty of contributory negligence and that appellees did not meet the burden of showing that the accident was not a 'consequence' whose prima facie responsibility was placed upon decedent; and further that no negligence on the part of the driver proximately causing the accident was shown. Still relying on insufficient evidence as its basis, appellant argues that the Court erred in granting appellees' requested instruction on the last clear chance doctrine.
 
 
 6
 The Louisiana cases establish clearly that a violation of the Highway Regulatory Act by walking on the right side of the highway, does not establish contributory negligence as a matter of law absolutely precluding recovery. Jackson v. Cook, 1938, 189 La. 860, 181 So. 195; Antoine v. Louisiana Highway Commission, La.App.1939, 188 So. 443, and Hollins v. Crawford, La.App.1942, 11 So.2d 641. When there is sufficient evidence from which the jury can determine liability on the motorist under the last clear chance doctrine, then the court is warranted in instructing the jury that they may predicate liability thereon even though the deceased may be guilty of contributory negligence in placing himself in a position of peril by walking on the right side of the highway. The jury here was properly instructed upon this theory of recovery,[5] and no objection was made except as to the sufficiency of the evidence to warrant the instruction.
 
 
 7
 An appellate court's scope of review in negligence cases involving factual issues has been clearly and comprehensively defined by the courts. We must not search the record for conflicting evidence which would warrant taking the case from the jury on the theory that the testimony gives equal support to divergent inferences. The jury's function is to select from among conflicting inferences and conclusions those which are considered the most reliable and reasonable. We are not free to reweigh the evidence merely because the jury could have drawn different inferences or conclusions. Tennant v. Peoria & P.U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. 'Where * * * the case turns on controverted facts and credibility of witnesses, the case is peculiarly one for the jury.' Ellis v. Union Pacific R. Co., 1947, 329 U.S. 649, 67 S.Ct. 598, 600, 91 L.Ed. 572.[6]
 
 
 8
 In reaching its conclusion as to negligence and proximate cause a jury is frequently called upon to consider many separate strands of evidence and from these to draw its ultimate conclusions. Jury findings on conflicting evidence are binding on this Court, which accepts as true that version of the testimony the jury might reasonably have adopted in reaching its verdict. Appellant can succeed only if it establishes that there is no substantial evidence to support the verdict, considering the evidence in the light most favorable to the appellee and clothing it with all reasonable inferences to be deduced therefrom. Jencks v. United States, 5 Cir., 1955, 226 F.2d 540; Swift & Co. v. Morgan & Sturdivant, 5 Cir., 1954, 214 F.2d 115; Atlantic Greyhound Corp. v. Crowe, 5 Cir., 1949, 177 F.2d 635, and Roundtree v. Post, 5 Cir., 1943, 134 F.2d 340.
 
 
 9
 With these principles in mind it is desirable to examine the credible evidence in more detail as it relates to the crucial question of fact. According to the testimony of the three companions of Dewey, the four were walking in pairs, Adams and Robinette being in the front pair, with Adams walking nearer the paved road; deceased and Seeds were in the back pair with deceased walking nearer the road. They were walking quietly forward in a straight line and deceased was between ten and eighteen inches from the edge of the pavement. The bus driver estimated that no boy was closer than eighteen inches to the pavement at any time, and some of the passenger witnesses placed the boys three or four feet away from the pavement. According to the three companions, there was no shoving or waiving of hands or deviation from normal walking in a straight line.
 
 
 10
 Five occupants of the bus, the driver, Borne, three passengers and the bus steward, also gave testimony as to what the boys were doing just prior to the accident. Borne stated that the boys were talking and laughing and waving their hands and touching each other on the shoulder and arms.[7] One of the passengers stated that the boys were playing, striking each other in a friendly way, and the other bus employee stated that they were waving their arms and 'philandering'.
 
 
 11
 Borne testified that he was driving at thirty miles an hour when he first observed the boys two hundred feet ahead of him and that he reduced his speed to twenty miles. Three of the occupants of the bus tended to corroborate this estimate of speed while a fourth passenger estimated the speed at from forty to forty-five miles an hour. The three companions testified that the bus was making between fifty and sixty-five miles an hour when deceased was struck.
 
 
 12
 Borne testified that he blew the horn at the boys when he was two hundred feet from them, and blew again when he was about eight feet away. But three out of the four occupants of the bus who testified failed to hear the horn. The three companions of deceased did not hear any horn at all.
 
 
 13
 Seeds testified that deceased did not veer from a straight line except to turn his head slightly to the left, remarking: 'Here it comes now.'[8] Borne, the driver, saw the boy on the left in the front pair raise his hand just before the bus reached him, and he was under the impression that he was the boy who had been struck. The driver did not see the accident and did not know one had happened except for the dull thud of the impact and remarks made by passengers. After blowing his horn within eight feet of the boys, he had taken his eyes off of them and looked into the rear-view mirror on his left to observe a car preparing to pass on his left.[9]
 
 
 14
 'Borne testified that, at the moment of impact, his bus was about one and one-half feet from the edge of the pavement, while Seeds, walking alongside deceased, testified that the bus was so close that he could almost reach out and touch it and that part of the right tire must have been off the paved road; and that deceased was struck while entirely off of the pavement a distance of at least ten inches and while he was turning his head to see the bus, a movement which brought his head not more than two inches nearer to the pavement. Borne testified that he drove his bus about eight hundred feet beyond the point of accident, having pulled it entirely off of the highway onto the shoulder.[10]
 
 
 15
 Under this evidence and the excellent pictures which were introduced, the jury could reasonably have found that the driver was operating a bus wider than the statutory maximum, within the limits of a city where traffic, both vehicular and pedestrian, was heavy, and thirty miles per hour was the speed limit; that he saw deceased and his companions in close proximity to the pavement, playfully jumping about, and realized that they were oblivious to the approach of the bus and consequently in a position of peril; that he failed to sound the horn or to reduce the speed,-- double the prescribed limit,-- or to veer to the left the few inches necessary to prevent the accident; but, instead, took his eyes off of the boys at the crucial moment and let the bus drift towards them so that the rear-view mirror assembly protruded several inches beyond the pavement and over the shoulder.
 
 
 16
 The law applicable to such a factual situation was well stated in Jackson v. Cook, supra (189 La. 860, 181 So. 197), wherein the Court said: 'The duty of those in charge of motor cars * * * to look ahead and observe never ceases; * * * what they can see they must see and in legal contemplation they do see; * * * their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability.'[11] In commenting upon the holdings of the Rottman and Jackson cases the Court, in Paquet v. Renken, La.App.1947, 30 So.2d 218, 220, stated: 'Since the decision of the Supreme Court in Rottman * * *, followed later by Jackson * * * and which has since been followed in many other cases, it is now recognized that there is a doctrine sometimes called 'discovered peril' * * * under which it is held that there is liability, if the defendant either discovers the peril of such a pedestrian, or, by the exercise of proper care, could have discovered it, and could have avoided an accident, even though the peril was created initially by the negligence of the pedestrian, himself. Under this doctrine, which is very much akin to the doctrine of last clear chance, and in fact is an off-shoot of that doctrine, it is the duty of the operator of an automobile to discover such peril and to follow that discovery by doing all that an ordinarily prudent person could have done to avoid the accident.'[12]
 
 
 17
 Under these decisions, issues of fact were clearly developed and the findings of the jury thereon have the support of the trial judge who observed the witnesses as they testified and refused to set the verdict aside or to enter judgment contrary to it. The charge under which the jury acted was one of unusual clarity, accuracy and completeness. We think that the case was tried carefully and fairly and that the result reached by jury and judge was amply warranted.
 
 
 18
 Appellant argues also that the $30,704.00 judgment was excessive as a matter of law under Louisiana authorities. In a Federal District Court the assessment of damages presents a question of fact to be determined by the jury subject to the right of the trial judge to set aside its finding or direct a remittitur. Gillen v. Phoenix Indemnity Co., 5 Cir., 1952, 198 F.2d 147, and State Farm Mutual Auto Ins. Co. v. Scott, 5 Cir., 1952, 198 F.2d 152. The Court here exercised this right and ordered a remittitur of $10,000.00. The amount of the judgment, when challenged upon motion for new trial, was within the discretion of the Court, and we cannot say that this discretion was abused. The judgment is Affirmed.
 
 
 
 [1]
 The verdict was originally for the total amount of $40,704.00, but appellees entered a remittitur of $10,000.00 pursuant to the order of Court that this be done or motion for new trial would be granted
 
 
 [2]
 The sole exception taken by appellant to the Court's charge was on this ground, and the exception is thus stated: '* * * there was no time when it could possibly have been apparent to the defendant operator that the plaintiff was in any position of peril, and not at any time had he been in a position of peril, and the doctrine of last clear chance would not be applicable.'
 
 
 [3]
 This measurement was made of a bus which was empty. The bus wes nearly filled with passengers at the time of the accident
 
 
 [4]
 The following sections of the Highway Regulatory Act of Louisiana, 18 LSA-R.S. are relevant:
 32:227 provides in part: '* * * No person shall operate any vehicle upon the highways of this state at other than a reasonable and proper speed under the circumstances, or at a speed endangering the persons or property of others. Whoever operates a vehicle in violation of the speed limitations of this Chapter shall be prima facie at fault and responsible for any accident proximately caused by such operation.'
 32:237 provides in part: 'Upon approaching a pedestrian upon the traveled portion of any highway, the driver shall sound a warning, * * * Pedestrians shall walk on their lefthand side of the highway as near as possible to the edge thereof, and are prima facie responsible for any consequence of this failure so to do.'
 32:273 provides: 'No vehicle shall exceed a total outside width of ninety-six inches * * *.'
 
 
 [5]
 The Court going even to the point of charging that the statute applied to the shoulders as well as the traveled portion of the road
 
 
 [6]
 See also Employers' Liability Assurance Corp. v. Madden, 5 Cir., 1955, 219 F.2d 205, and Skene v. O'Dwyer, 5 Cir., 1953, 204 F.2d 909
 
 
 [7]
 At one time he stated: 'I wouldn't say exactly (that they were) zigzagging, but you could tell they were bouncing up and waving hands (indicating with hands).'
 At another place he stated that all four of them were waving theirs hands.
 
 
 [8]
 The four boys had hitchhiked out from New Orleans to the road (covered by traffic light) which entered the airport. After alighting from the car they had walked north along the shoulder seven hundred seventy-three feet and had had some discussion about catching a bus, but no firm decision had been reached
 
 
 [9]
 The object of looking back is not shown as it was undisputed that the bus was in the right lane and there was plenty of room for passage in the left lane. None of the passengers who testified corroborated Borne's testimony about the passing car and one tended to contradict it
 
 
 [10]
 Charts in general use show that a vehicle running at twenty miles an hour requires a total stopping distance of between forty-seven and sixty-two feet, counting driver-reaction time, and varying according to the weight of the vehicle
 
 
 [11]
 See also Rottman v. Beverlee, 1935, 183 La. 947, 165 So. 153
 
 
 [12]
 And see also Cooper v. Kennard, La.App.1939, 192 So. 534; Dyck v. Maddry, La.App.1955, 81 So.2d 165; Hollins v. Crawford, La.App.1942, 11 So.2d 641; Baquie v. Meraux, 1929, 11 La.App. 368, 123 So. 338; Holliday v. Hartford Accident & Indemnity Co., La.App.1949, 38 So.2d 235; Hanson v. Great American Indemnity Co., La.App.1947, 33 So.2d 549; and Culpepper v. Leonard Truck Lines, 1945, 208 La. 1084, 24 So.2d 148