**Percy HOOD and Grace Hood, His Wife, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 15267.**

United States Court of Appeals Ninth Circuit.

March 17, 1958.

Donald M. Bushnell, Ferndale, Wash., for appellants.

Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Reginald W. Barnes, Attys., Dept. of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., F. N. Cushman, Asst. U. S. Atty., Seattle, Wash., for appellee.

Before LEMMON, FEE and HAMLEY, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

The Hoods brought a suit in a Superior Court in the State of Washington against the United States to quiet title [1] to lands

---

1. Consent of the United States to such a suit is found in 28 U.S.C.A. § 2410(a), which provides that the United States "may be named a party to a civil action or suit in any district court * * * or in any State court having jurisdiction of the subject matter, to quiet title to * * * real or personal property on which the United States has or claims a mortgage or lien."

formerly within the boundaries of the Lummi Indian Reservation, but which are now indubitably owned by them in fee simple and upon which the United States claimed a lien.[2] The cause was removed to the federal court by the government,[3] where a counterclaim for foreclosure of the lien was filed against the Hoods. The trial court held the lands were subject to a lien for the construction costs, together with operation and maintenance charges, of dikes built under Act of Congress to reclaim some 4,000 acres of land in and adjacent to the Reservation.

There are two questions involved. First, did Congress intend to and possess the power to impose a lien upon the lands here involved? Second, are charges for operation and maintenance a lien upon the lands?

The following facts appear from the record. The lands were patented to Mary Yah-Him-A-Loo, in fee simple, subject to restrictions against alienation in 1884. Pursuant to statute and regulations, Mr. Dickens, Superintendent of the Reservation, on November 10, 1925, executed a memorandum of sale of these lands to the Hoods, as Indian heirship property after the decease of the original patentee. At the same time, Dickens, as guardian of minor Indian heirs and the adult Indian heirs, executed a deed to the Hoods upon payment to Dickens, as Superintendent, of $2,515 on the purchase price of $10,100. The agreement provided that "upon payment in full * * * then and in such case a deed duly executed by said heirs * * * and approved by the Secretary of the Interior, shall be delivered to said Percy Hood and Grace H. Hood, his wife, conveying said land to them and their heirs pursuant to law." The other provisions gave the Secretary

the option of forfeiture in the event of nonpayment and provided that the deed should be retained in escrow by the Commissioner of Indian Affairs and delivered to the purchaser upon payment in full. The deed deposited in escrow was executed by all twenty-three of the adult heirs before January 16, 1926.

On March 18, 1926, an Act was passed by Congress authorizing an appropriation for the construction of dikes to reclaim some 4,000 acres of land in and adjacent to the Lummi Indian Reservation.[4] Some of the land was Indian land and some was owned by private individuals. The Act provided that the cost of the project would be distributed equitably among the lands in Indian ownership and those in private ownership which might be benefited by the project. A lien was imposed upon all Indian land for the pro rata share, and the existence of the lien was to be recited in any patent issued therefor. It was provided that no money should be expended for construction on account of any lands in private ownership until repayment contracts were executed by the owners of the private lands benefited, by which liens would be imposed thereon also.

The deed in accordance with the land sale contract was executed by the twenty-three heirs of Mary Yah-Him-A-Loo and by the Superintendent, Walter F. Dickens, as legal guardian for four named minors, on November 10, 1925, and was approved by the Secretary of the Interior, by his Assistant, on or about August 10, 1926. Two deeds covering the individual interests of the minors were also executed by the Superintendent and also approved by the Secretary. Hood then was given a copy of the contract signed by the Superintendent and bearing the approval of the Secretary,

**2.** This action initially included other parties plaintiff who sought to quiet title to their lands. As to them, the trial court found the asserted liens of the government without foundation and void. Only the Hoods appeal.

**3.** Authorization for removal was found in 28 U.S.C.A. § 1444, which provides that

"any action brought under section 2410 of this title against the United States in any State court may be removed by the United States to the district court of the United States for the district and division in which the action is pending."

**4.** Act of March 13, 1926, 44 Stat. 211.

but all the deeds were retained in escrow. After the Hoods had paid the notes for the balance of the purchase price, the deeds above described were delivered out of escrow to the Hoods on or about the month of April, 1928.

As to a great deal of acreage, the Department of the Interior did not obey the specific injunction of Congress that no money should be expended until repayment contracts were executed by the owners of private lands benefited.[5] Instead, the construction was completed and on August 19, 1930, the Secretary of the Interior promulgated, pursuant to Section 4 of the Act of March 18, 1926, his "public notice" reciting that he was distributing the total cost of the project among the lands benefited, in accordance with a schedule made a part of the notice by reference. 25 C.F.R. § 144 (1949). In this schedule there were included lands of a number of white owners who had not signed the "repayment contract" provided by law. It is notable that the Secretary of the Interior listed the Hoods as white owners. Thereafter, the agents of the Secretary of the Interior attempted to obtain contracts from all who had not signed. The Hoods, among others, have never signed a "repayment contract."

Because of the confusion caused by the publication of the public notice and the schedule of charges, the Hoods and others holding land in white ownership, against whom a lien was apparently imposed under its terms, commenced suit to clear title against the United States. The cause was removed to the federal District Court. After trial, the court found all the plaintiffs other than the Hoods entitled to have titles to their several lands quieted against the asserted lien of the government. Foreclosure against the lands of the Hoods on the counterclaim of the government was decreed. This appeal followed.

At the threshold, this Court was confronted with the question of jurisdiction. A reargument of the case on this feature was required. No lien claimed upon any of the several parcels amounted to $3,000. A similar case had originally been commenced by certain landowners in the federal District Court, but was later dismissed by our opinion in Wells v. Long, 9 Cir., 162 F.2d 842. Thereupon, the instant suit was commenced in the state court and was removed by the government pursuant to 28 U.S.C.A. § 1444. If it now be held that this cause must be dismissed on jurisdictional grounds, the enactment will be for all practical purposes meaningless.[6]

The cardinal concern of the United States is that all cases in which the interests of the government are involved may be tried in federal fora. Such interests may be vitally enmeshed in a case which is of negligible pecuniary value. The judicial power of the federal courts extends to any controversy to which the United States is a party.[7] There are other statutes which accord to the United States the right to remove certain cases at its sole option without regard to the amount in controversy.[8] If then the right of removal here is denied, the government will be forced to foreclose liens of a value less than $3,000 in the state courts, unless an independent suit is first

---

5. "No part of the sum provided for herein shall be expended for construction on account of any lands in private ownership until an appropriate repayment contract in accordance with the terms of the Act and in form approved by the Secretary of the Interior shall have been properly executed by the landowners whose lands may be benefited by the project." Act of March 18, 1926, 44 Stat. 211, 212.

6. In the Wells case, this Court recognized the principle that the mere existence of a consent statute does not in itself con-

fer jurisdiction on a federal court, and jurisdiction cannot be predicated merely upon the fact that the United States is a party, "unless the United States [pursuant to the removal statute] invokes the jurisdiction of [the federal] court." Wells v. Long, 9 Cir., 162 F.2d 842, 844. See also Venable v. Richards, 105 U.S. 636, 26 L.Ed. 1196.

7. United States Constitution, art. III, § 2, cl. 2.

8. 28 U.S.C.A. §§ 1442, 1442a.

filed in the federal court. The fact that the United States did remove and affirmatively sought to foreclose these liens by counterclaim establishes conclusively the interest of the United States here.[9] The right to remove cannot be denied. The trial court asserted jurisdiction. We hold this conclusion correct, since the removal statute seems plain.[10]

It is first urged that the Indian predecessors of the Hoods held fee simple title to these lands, subject to a restraint upon alienation, in that the approval of the Secretary of the Interior upon a conveyance was required. It is further contended by the Hoods that a restricted fee patent [11] had already issued to such Indians, and that, if the allotment act contemplated that a reservation of liens would be included in the patent, a special clause would be required therein. Thus the contention is made that the trustee is bound not to impose additional burdens upon the estate. Upon the other hand, the government claims that there is no substantial difference between restricted

property and trust property and that Congress has a right to legislate for the purpose of protecting those who are unable yet to assume a fully independent status as to their property, even though individual property rights may be impaired. We do not examine the merits of, or pass upon, these questions.

■ The position taken by the Hoods, that there is no lien in existence upon these lands in favor of the government by virtue of the Act of Congress, may be sustained upon several grounds. The Act of Congress applied a lien to lands in Indian ownership.[12] It is demonstrable that this real property was not in Indian ownership even when the act became law. Furthermore, by any standard, title to this parcel had passed to the Hoods before the prescribed procedure of the Act to establish the lien had been initiated, to say nothing of procedure to perfect it. There are three methods of establishing these facts. First, the agents charged with the administration in construing the statutes relating to

9. The reasoning of a District Court on the interpretation of 28 U.S.C.A. §§ 1444 and 2410 seems persuasive: "28 U.S.C.A. § 2410 waives the immunity of the United States in an action to foreclose a lien upon * * * property, upon which the United States * * * claims to have a lien. * * * Such immunity, however, is granted under the condition * * * which gives the United States the unqualified option to remove such an action to the district court. It follows that the immunity waived is conditional upon the right of removal, and should that right be withheld or thwarted, it would seem to follow that the immunity is withdrawn. It follows, therefore, that there is no basis upon which this court can remand the case over the objection of the United States." Vincent v. P. R. Matthews Co., D.C., 126 F.Supp. 102, 105. It must be noted that, if the trial court had no jurisdiction under the removal statute, the cloud on the title on all the other lands in white ownership would still remain. Apparently, all parties agree these cases were correctly decided, since there has been no appeal. Our holding that there is jurisdiction clears these titles.

10. "This broader grant of removal juris-

diction [28 U.S.C.A. § 1444] is constitutional for the reason that the United States is a defendant, and for its protection and in the interest of a complete determination of the litigation Congress may provide for removal of not only the controversy that affects the United States but also the other defendants even though they could not be sued alone in the federal court." Moore's Commentary on the United States Judicial Code, paragraph 0.003(40), page 259.

11. The distinction between a "trust patent" and a "restricted fee" patent is discussed in Cohen, Handbook of Federal Indian Law, pp. 109–110, 206–207 (United States Department of the Interior, Office of the Solicitor, 1941).

12. The portion of the statute providing for the creation of liens against lands in Indian ownership is as follows: "The construction charge properly assessable against the Indian lands shall be reimbursed * * * under such rules and regulations as the Secretary of the Interior may prescribe, and there is hereby created a lien against all such lands, which lien shall be recited in any patent issued therefor * * *." Act of March 18, 1926, 44 Stat. 211, 212.

trust and restricted lands of Indians had long recognized that a contract by the United States to convey title thereto, signed by the appropriate agent, removed the land from government jurisdiction except for the purpose of enforcing the promises of the vendee or of rescinding upon default.

It is universally held that the course of conduct of the officers of an agency of the United States, who are chosen to construe and enforce laws relating to a particular subject, if long continued, will be given great weight in interpreting the statutes they administer, and will have binding force of law. This is called the doctrine of administrative construction.[13] The Department of the Interior has long recognized that a sale by the government, when made in pursuance of law, confers upon the purchaser equitable title to the premises to the same extent as a sale by an individual holding the fee. And, if all the conditions upon the part of the purchaser to be performed have been done and the land is conveyed without technical approval of the officer required to approve, the transaction still conveys title and any time thereafter the appropriate official will perform the clerical amendment according to the prescribed formula.

Second, because of the execution of the contract of sale, the familiar doctrine of equitable conversion came into effect.[14] In virtue of that theory, if two private parties had entered into a contract for sale and purchase of land in proper form and both died, the executor of the estate of the vendor would have received the amount that had been paid in upon the purchase price and would have been possessed of the obligation against the estate of the vendee for payment of the balance. The heirs at law of the vendee, on the other hand, would have taken possession of the real property conveyed and been seized in fee as soon as legal title passed. This situation is the same, even though the remedy of specific performance might lie on either hand or where the right was given by the contract to the vendor to avoid the contract for breach of condition at a subsequent date. It was expressly stated in the contract that the Secretary of the Interior, at his option, upon default of payment of the purchase price, might rescind the transaction and take back the title of these lands for the benefit of the Indian heirs and thereupon would have been required to pay to the Hoods a certain percentage of the purchase price which had already been paid in.

Thus, in the instant case, the United States ceased to be trustee of the bare legal title to the real property for the Indian heirs and became trustee

13. "* * * administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L. Ed. 796. See also United States v. Leslie Salt Co., 350 U.S. 383, 397, 76 S.Ct. 416, 100 L.Ed. 441; United States v. Zucca, 351 U.S. 91, 96, 76 S.Ct. 671, 100 L.Ed. 964.

14. The Supreme Court early stated that the effect of the doctrine on a land sale contract was that the vendor "held the legal title as trustee for [the vendee] * * * and * * * [the vendee] was trustee for * * * [the vendor] as to the purchase money. * * * [the vendee] was cestui que trust as to the former and * * * [the vendor was

cestui que trust] as to the latter. * * the seller under such circumstances has a vendor's lien, 'which is certainly not impaired by withholding the conveyance.' The equitable estate of the vendee is alienable, descendible and devisable in like manner as real estate held by the legal title." Lewis v. Hawkins, 23 Wall. 119, 125, 90 U.S. 119, 125, 23 L.Ed. 113. "This is the doctrine * * * founded upon the principle, that courts of equity, regarding the substance and not the mere form of contracts * * *, consider things directed or agreed to be done, as having been actually performed." Peter v. Beverly, 10 Pet. 532, 563, 35 U.S. 532, 563, 9 L.Ed. 522. See also Stone, Equitable Conversion by Contract, 13 Columbia Law Review 369. The doctrine of equitable conversion is widely recognized and applied.

of the proceeds of sale in their behalf. The United States, by virtue of this contract, was thereafter trustee of the bare legal title of these lands for the Hoods, who were the equitable owners. The Indians had given a valid deed to their equity, which only awaited delivery after formal approval. Only after default the United States, as trustee then of both the legal and equitable titles, could avoid the transaction. The land was therefore not in Indian ownership after the signing of the contract to convey on November 25, 1925. Congress did not intend to impose an automatic lien upon lands held in private ownership on March 18, 1926, and could not impose a lien upon the title after that date.

Third, the contemporaneous construction placed upon the contract, deed and the Act of March 18, 1926, proves the passage of equitable title before the Act in question was passed and legal title vested in the Hoods on November 10, 1952.

Indeed, the agents of the government in this instance did construe the contract of sale as having passed the title. Inasmuch as they were burdened with responsibility of enforcing the laws and regulations relating to this conveyance, their acts effectively construe the contract and are quite convincing in character.

The Superintendent of the Indian agency, who is an employee of the government and who was fully empowered to do so by the laws and regulations then in force, which were followed strictly, sold this land to the Hoods. By virtue of that written contract of sale, the government promised to obtain a deed from the adult heirs and to take the proper steps to obtain a deed in proper form as to the interests of the minor heirs. It also promised to obtain a deed approved by the Secretary of the Interior.[15] Upon their part, the Hoods promised to pay the full purchase price.

■ The Superintendent obtained the signatures of all the adult heirs who executed the document on January 16, 1926. Thereupon, he proceeded to have himself appointed guardian of the four minor Indian heirs by process of the Superior Court of the State of Washington, and, as guardian and pursuant to the contract with the Hoods and by order of the state court, executed deeds conveying the interests of the minor heirs to this property. In this proceeding, it was explained that the purchase price was a lump sum and only a pro rata share would be due the minors. On August 10, 1926, pursuant to the contract, the contract itself was stamped approved by the office of the Secretary of the Interior. The deeds were approved by the Acting Secretary of the Interior and placed in escrow, strictly according to the provisions of the agreement. When the purchase price was paid in full, these deeds were delivered to the Hoods and recorded with the approval of the Secretary of the Interior upon them. It will be noted that during this whole period there was no attempt by the Secretary of the Interior or the Superintendent or any agent of the government to attempt to condition the passing of title by the acceptance of the lien provided for by the statute. Inasmuch as the Act of March 18, 1926, contains a provision that a patent to an Indian shall contain a notation of the imposition of the lien,[16] it seems clear that the agents and attorneys of

15. The memorandum of sale provided in part: "That upon the payment in full by said Percy Hood and Grace H. Hood * * * a deed duly executed by said heirs of Mary Yah-Him-A-Loo, and approved by the Secretary of the Interior, shall be delivered to said Percy Hood and Grace H. Hood * * * conveying said land to them and their heirs pursuant to law. * * * It is further understood and agreed that the deed hereinbefore provided for shall be retained in escrow by the Commissioner of Indian Affairs until all the notes and interest before mentioned shall have been paid, when it shall be delivered to Percy Hood and Grace H. Hood, his wife, as hereinbefore provided."

16. "The construction charge properly assessable against the Indian lands shall be reimbursed to the Treasurer of the

the government did not believe they had the power to condition either the deeds or the approval of the Secretary with such a burden. By other conduct, the agents of the government have indicated that they believe this title was not presently encumbered in virtue of the statutory provision. The evidence shows that they have consistently attempted to obtain a "repayment contract" from the Hoods and that this has been consistently refused because the Hoods believed these lands obtained no benefit from the improvement. The contemporaneous construction, therefore, was that title passed finally upon the execution of the contract by the agent and the Hoods, subject to the condition subsequent of default of the Hoods.[17]

It is probable here that there is no necessity to rely upon the doctrine of "relation back" to make the approval of the Secretary of the Interior of August 10, 1926, effective as of the date of the memorandum of sale and deed, November 10, 1925, since, according to the thesis set out above, the United States would have broken the contract if it failed to have the approval of the Secretary of the Interior upon the deed when the purchase price was paid. But the cases do refer to this doctrine under circumstances which are much more difficult than those involving the transaction in

the case at bar. In Pickering v. Lomax, 145 U.S. 310, 12 S.Ct. 860, 36 L.Ed. 716, and in Lomax v. Pickering, 173 U.S. 26, 19 S.Ct. 416, 418, 43 L.Ed. 601, Indian lands were patented to one Robinson, an Indian, with a clause restricting the right to convey without the permission of the President. The heir of Robinson, by deed dated 1858, conveyed to Horton. This deed was recorded without any approval by the President. Horton died and his administrator conveyed to Baer. There were several intermediate conveyances of the title down to a deed to Aquila H. Pickering. The latter, on January 21, 1871, procured approval by the President of the original deed. However, the heir of Robinson had conveyed the same property, again by deed, to McClure on November 22, 1870, and this purported conveyance was inadvertently approved by the President on February 24, 1871. The Supreme Court of the United States held that "the approval of the president related back to the execution of the deed and validated it from that time," and that the first grantee, Horton, took title since the record of the deed in 1858 gave notice, and therefore the second vendee, McClure, was not a bona fide purchaser for value. A like result, under a very difficult situation, was reached in Lykins v. McGrath, 184 U.S. 169, 22 S.Ct. 450, 46 L.Ed. 485.[18] Other cases which apply

---

United States under such rules and regulations as the Secretary of the Interior may prescribe, and there is hereby created a lien against all such lands, which lien shall be recited in any patent issued therefor, prior to the reimbursement of the total amount chargeable against such lands." Act of March 18, 1926, 44 Stat. 211, 212.

17. Not only was the government bound by the approval of the Secretary of the Interior to the deed before the notice of imposition of lien in accordance with the Act, but the administrative act of including this property, when in white ownership, was invalid because there was an attempt thereby to reverse the previous administrative interpretation and contemporaneous construction. See United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 424: "Against the Treasury's prior longstanding and con-

sistent administrative interpretation its more recent * * * contention as to how the statute should be construed cannot stand."

18. "What was the purpose of imposing a restriction upon the Indian's power of conveyance? Title passed to him by the patent, and but for the restriction he would have had the full power of alienation the same as any holder of a fee-simple title. The restriction was placed upon his alienation in order that he should not be wronged in any sale that he might desire to make; that the consideration should be ample; that he should in fact receive it, and that the conveyance should be subject to no unreasonable conditions or qualifications. It was not to prevent a sale or conveyance, but only to guard against imposition therein. When the Secretary approved the conveyance it was a deter-

the same doctrine are set out below.[19] Here there is no question of innocent third parties involved. The agents of the government could have been advised by their own records that the land had already been conveyed before Congress attempted to place a lien upon it.

We have seen equitable title passed by the contract of November 10, 1925. At the date of the passage of the Act of March 18, 1926, neither Congress nor the administrative department could impose a burden on the contract, which was binding upon the United States from date of signing. The legal title held by the United States could only have been impressed with the lien for these improvements if the statutory formula had been followed or if an express stipulation of the contract or deed reserved the right to impose future liens. There was no such reservation. The statutory formula was not followed.

■ It must be said that the agents of the government did not attempt to impose this lien upon this specific piece of property until the publication of the notice specifying this property as one subject to the encumbrance in August, 1930, long after the deed approved by the Secretary of the Interior had been duly delivered to the Hoods and they were in complete possession of the land. Of course, the statute itself did not impose a lien. Some definite act of the administrative agents, declaring the intention to place a charge in a specific amount on a particular parcel, is necessary.[20] Since the notice was given more than two years after delivery of the deed, no lien could be created thereby.

■ It is abundantly clear also that the agents of the Secretary of the Interior violated the Act of Congress by failing to obtain repayment contracts from the owners of private lands benefited by the improvement before the expenditure of any money of the appropriation for the construction of these dikes.[21] There was thus no lien upon any of these lands, and the Secretary of the Interior was ill advised when he included such lands in the schedule of charges allocating pro rata cost of construction. This instrument constitutes a cloud on the title of the Hoods, which they are entitled to have removed. Appropriate decree should enter therefor.

The foregoing discussion also shows that the record is devoid of any foundation whatsoever for the imposition of any charge for operation or maintenance upon the Hoods.

The decree will be modified only by including the lands of the Hoods among those in white ownership, which cannot be subjected to lien by the United States for the construction or maintenance.

---

mination that the purposes for which the restriction was imposed had been fully satisfied * * *. All this being accomplished, justice requires that the conveyance should be upheld, and to that end the doctrine of relation attaches the approval to the conveyance and makes it operative as of the date of the latter." Lykins v. McGrath, 184 U.S. 169, 171–172, 22 S.Ct. 450, 451.

19. Hallam v. Commerce Mining & Royalty Co., 10 Cir., 49 F.2d 103, 107; Anchor Oil Co. v. Gray, 8 Cir., 257 F. 277. See Scioto Oil Co. v. O'Hern, 67 Okl. 106, 169 P. 483.

20. The Act authorized and directed the Secretary of the Interior "to declare by public notice the cost of the project and the equitable share to be assessed against the lands benefited in accordance with their respective benefits * * *." 44 Stat. 211, 212. "The construction charge properly assessable against the Indian lands shall be reimbursed to the Treasury * * * and there is hereby created a lien against all such lands * * *." 44 Stat. 211, 212.

21. The Act provides that, in regard to privately owned lands, that is, other than Indian lands, "no part of the sum provided for * * * shall be expended for construction on account of any lands in private ownership until an appropriate repayment contract in accordance with the terms of this Act and in form approved by the Secretary of the Interior shall have been properly executed by the landowners whose lands may be benefited by the project." Act of March 18, 1926, 44 Stat. 211, 212.

LEMMON, Circuit Judge (dissenting).

I dissent, because I am of the opinion that the Court below lacked jurisdiction over the subject-matter of the suit.

1. The complaint, filed in the Superior Court for Whatcom County in the State of Washington, asserts that "The action is authorized by Section 2410, Title 28, United States Code [Annotated]".

The pertinent subsection of § 2410 reads as follows:

"(a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, including the District Court for the Territory of Alaska, or in any State court having jurisdiction of the subject matter, *to quiet title to or for the foreclosure of a mortgage or other lien upon real or personal property on which the United States has or claims a mortgage or other lien.*" [Emphasis supplied.]

2. The appellants, who were the plaintiffs below, concede that § 2410(a) is merely a "consent" statute, and that therefore "jurisdiction of the subject matter must be found independently of it". In support of this concession, the appellants cite Wells v. Long, 9 Cir., 1947, 162 F.2d 842, 844, in which Judge Healy said:

"The purpose of the statute immediately involved is merely to waive sovereign immunity from suit in certain types of cases, *not to confer jurisdiction* on courts to hear and determine such cases in the ordinary sense. It presupposes that the court in which such suit is pending or brought has jurisdiction thereof on grounds independent of the statute." [Emphasis supplied.]

Judge Healy was there considering 28 U.S.C.A. §§ 901–906, the predecessor of § 2410, supra. He continued:

"As already noted, the act gives the United States alone the right of removal to the federal court. Unless the United States invokes the jurisdiction of that court, and it has not done so here, federal jurisdiction can not be predicated merely on the fact that the United States is a party."

The former § 903 of 28 U.S.C.A., supra, quoted in Judge Healy's opinion, provided in part that "any such suit brought against the United States in any State court may be removed by the United States to the United States district court for the district in which the suit may be pending."

I do not think that, by this *obiter dictum,* Judge Healy intended to say that, if the jurisdictional amount of more than $3,000 were lacking in the suit brought in the State court, by some juridical legerdemain Federal jurisdiction could be conferred by the simple device of having the case transferred to the Federal Court, even though if the suit had originally been brought against the United States in the *Federal* instead of the *State* court, the United States District Court would have lacked jurisdiction because of the lack of the required amount. If Judge Healy intended so to hold, however, I cannot go along with such a view. See Paragraph 4, infra.[1]

3. The appellants concede that "All of the asserted liens were less than the $3,000.00 minimum required for initial federal jurisdiction; *therefore the action was filed in the state court.*" [Emphasis supplied.]

4. The appellants, however, seem to think that there *was* some jurisdictional magic in the removal to the Federal Court; for they continue:

---

1. See also the concise and lucid statement of Chief Judge Lederle in Haldeman v. United States, D.C.Mich.1950, 93 F. Supp. 889, 890; the well-reasoned opinion of Judge Hamley in Seattle Associa-tion, etc., v. United States, 1957, 9 Cir., 240 F.2d 906, 908; and Aetna Insurance Co. v. Chicago R. I. & P. R. Co., 10 Cir., 1956, 229 F.2d 584, 586.

"However after due service of process the appellee removed it to the District Court below, under authority given by 28 U.S.C.[A. §] 1444, which provides that 'any action brought, under section 2410 may be removed [by the United States to the district court of the United States for the district and division in which the action is pending].'"

For the reasons stated in Paragraph 2, supra, I do not agree with this view. In my opinion, § 1444, supra, is purely and simply a *removal* statute, and does not *of itself independently confer jurisdiction* upon the District Court regardless of the jurisdictional amount of more than $3,000, required under 28 U.S.C.A. § 1331. I do not think that it makes any difference at *whose* instance the case is removed to the Federal Court: the jurisdictional amount must be present.

5. The amounts in controversy in the various claims embodied in the suit as originally brought in the State court cannot be *added* to meet the jurisdictional requirements, because the claims are not sufficiently *related*. The appellants themselves point out:

"Those allegations of the complaint bearing on the matter by which the alleged liens were asserted and the titles of the several plaintiffs clouded were common to all of them. *But as [to] the nature or state of the ownership there were allegations distinctive to the land of appellants, the Hoods. Although all of the tracts were originally reservation lands, which had been anciently allotted to individual Lummis, those of the non-Hood plaintiffs, it was averred, had come by mesne conveyance into 'private' (and non-Indian) 'ownership' long prior to the passage of the Act.* [Emphasis supplied.]

\*    \*    \*    \*    \*    \*

"As to appellants' lands, however, the complaint charged that the Unit-ed States claimed that it held an *automatic* lien under the Act because the lands were in 'Indian ownership' of record at its effective date," etc. [Emphasis supplied.]

In their complaint, the appellants allege that the land was sold to them on November 10, 1925, by means of an escrow deed, approved by John H. Edwards, Assistant Secretary of the Interior, on August 10, 1926—long after the enactment of 44 Stat. 211, the so-called "Diking Act", of March 18, 1926.

In Clark v. Paul Gray, Inc., 1939, 306 U.S. 583, 589, 59 S.Ct. 744, 748, 83 L.Ed. 1001, Mr. Justice (later Mr. Chief Justice) Stone said:

"It is a familiar rule that when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and that those amounts cannot be added together to satisfy jurisdictional requirements. [Cases cited.]"

As we have seen, the demands of the Hood and "non-Hood" plaintiffs are decidedly "separate and distinct", as emphasized in the appellants' own brief.[2]

6. Again, we find another statement by Mr. Justice Stone emphasizing the strict construction to be given to this type of statute. In the leading case of Healy v. Ratta, 1934, 292 U.S. 263, 269–270, 54 S.Ct. 700, 703, 78 L.Ed. 1248, he said:

"From the beginning suits between citizens of different states, *or involving federal questions*, could neither be brought in the federal courts nor removed to them, unless the value of the matter in controversy was more than a specified amount. \* \* \* *The policy of the statute calls for its strict construction.*" [Emphasis supplied.]

2. See also Rock Drilling, Blasting, etc., v. Mason & Hanger Co., 2 Cir., 1954, 217 F.2d 687, certiorari denied, 1955,

349 U.S. 915, 75 S.Ct. 604; and Aetna Insurance Company v. Chicago R. I. & P. R. Co., supra, 229 F.2d at page 586.

7. Nor can it be said that 28 U.S.C.A. § 1353 gives the District Court jurisdiction in this case. That section is in part as follows:

"*1353. Indian allotments.* The district courts shall have original jurisdiction of any civil action involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty."

The appellants here are not claiming under any Indian allotment, but by virtue of their "private ownership" of the land in question, acquired by means of a "bid" from them, accepted by the Superintendent of the Indian Agency, and by a deed approved by the Secretary of the Interior. The appellee claims that the tract was in Indian ownership, but concedes that the appellants are "holding title to [the] land in *'white ownership'* ". *There is, accordingly, no claim here by any person "in whole or in part of Indian blood to any allotment of land".* Neither party here invokes § 1353.

8. Finally, the majority opinion asserts that "The fact that the United States did remove and affirmatively sought to foreclose these liens by counterclaim establishes conclusively the interest of the United States here."

The difficulty with this contention, however, is that the jurisdiction of a Federal court in a case of this kind is determined by the *complaint,* and not by subsequent pleadings.

In Mosher v. City of Phoenix, 1932, 287 U.S. 29, 30, 53 S.Ct. 67, 77 L.Ed. 148, Mr. Chief Justice Hughes said:

"There is no diversity of citizenship, and jurisdiction depends upon the presentation *by the bills of complaint* of a substantial federal question. Jurisdiction is thus determined *by the allegations of the bills* and not by the way the facts turn out or by a decision of the merits." [Emphasis supplied.]

Again, in Bell v. Hood, 1946, 327 U.S. 678, 681, 66 S.Ct. 773, 775, 90 L.Ed. 939,

Mr. Justice Black used the following language:

"Before deciding that there is no jurisdiction, the district court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States. For to that extent 'the party who *brings a suit is master* to decide what law he will rely upon, and * * * does determine whether he will bring a "suit arising under" the * * * [Constitution or laws] of the United States by his declaration or bill.' [Case cited.]" [Emphasis supplied.]

For the above reasons, I believe that the District Court lacked jurisdiction over the subject matter of the suit. The case should be remanded to the Court below, with instructions to dismiss the action.