**COTTON PETROLEUM CORPORATION and Shell Oil Company, Plaintiff–Appellants,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, BUREAU OF INDIAN AFFAIRS; Kenneth L. Smith, Assistant Secretary, Indian Affairs; Rupert Thompson, Superintendent, Anadarko Agency; Newton Rose, Winston Rose, Wesley Rose, Nelson Rose, Theodosia Harris, and John Rose, Defendant–Appellees.**

No. 87–1191.

United States Court of Appeals, Tenth Circuit.

March 20, 1989.

**1516**

Kent L. Jones (Orval E. Jones, with him on the brief) of Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Inc., Tulsa, Okl., for plaintiff-appellants.

Dirk D. Snel (F. Henry Habicht, II, Asst. Atty. Gen., and Laura E. Frossard, Department of Justice, with him on the brief; J. McLane Layton, Office of the Sol., Dept. of the Interior, of counsel, with him on the brief), Dept. of Justice, Washington, D.C., for federal defendant-appellees.

Patricia L. Brown (Jap W. Blankenship of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., of counsel, with her on the brief) of Wilkinson, Barker, Knauer & Quinn, Washington, D.C., for Rose defendant-appellees.

Before McKAY, BARRETT and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

Cotton Petroleum Corporation and Shell Oil Company, hereinafter jointly referred to as Cotton or lessee, appeal from the district court's order denying their motion to amend the court's order granting summary judgment unto the defendants, United States Department of the Interior, et al., and Newton Rose, et al. All parties filed motions for summary judgment. The parties agree that the material facts are uncontroverted. Our jurisdiction vests under 28 U.S.C. § 1291.

### Background

The dispute in this case involves an 80–acre tract of restricted Indian allotment land owned by Newton Rose, et al., which was leased for oil and gas to Shell Oil Company, on January 17, 1979, for a primary term of three years pursuant to terms approved by the Superintendent of the Anadarko Agency, Bureau of Indian Affairs (BIA), Department of the Interior. The lease was thereafter assigned by Shell to Cotton. The Rose tract is located within a 640–acre drilling and spacing unit for the production of gas, pursuant to a spacing order entered by the Oklahoma Corporation Commission in June of 1975. The Rose lease, issued following bids, involved a bonus payment of $11,021.00 or some $135.00 per acre. It contained, *inter alia*, the following express covenants:

Par. 1: ...

[I]f the lessee shall commence to drill a well within the terms of this lease, the lessee shall have the right to drill such well to completion with reasonable diligence and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years herein first mentioned.

Par. 11:

Unit operation.—The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision.

(R., Vol. II, Tab 57, Exhibit D).

All of the lands in Section 6, wherein the Rose 80–acre tract is situated, are restricted Indian allotment lands with the exception of one 40–acre non-Indian ownership tract.

On December 30, 1981, Cotton, as operator, commenced drilling a well in the unit area and the well had been drilled to a depth of some 5200 feet when, in January, 1982, Cotton submitted a communitization agreement, which had been adopted by a majority of the Unit area working interest owners, to the Department of Interior for its approval as to the Rose tract and other Indian allotment tracts in the unit. On January 12, 1982, prior to the expiration of the primary term of the Rose lease (January 17, 1982), the United States Geological Survey, Minerals Management Service (MMS), the first of a three-step Department of the Interior agency process of review for approval, recommended that the

communitization agreement be approved by the Anadarko Area Director in that it "[o]ffers adequate protection to the restricted Indian interests." (R., Vol. II, Tab 69). The Superintendent of the Anadarko Agency concurred, completing the second step in the process, and forwarded the communitization agreement to the Area Director for his review and approval on January 15, 1982. Newton Rose contacted the Area Director prior to January 17, 1982, and requested that he not approve the communitization agreement and permit the Rose lease to expire so that it would be open for new leasing at a substantially greater bonus sum than that paid by Shell Oil Company. The Area Director requested additional information from the MMS which he received on January 22, 1982. The Area Director approved the communitization agreement on February 11, 1982, completing the three-stage process.

The Area Director observed that: the primary purpose for leasing constitutes an agreement between lessor and lessee whereby the ultimate goal is production through a joint effort; refusal to approve a communitization agreement defeats the primary purpose of the lease; the agreement had been timely submitted before any affected lease had expired and the drilling operations on the unit had been diligent; and, it is not feasible to release an isolated 80–acre tract because it is not likely that an oil company would be interested in drilling the second well, when it has been determined that the common source of supply may be drained by one well. The Area Director further observed that the Indian lessors had no objection to the communitization agreement but simply wanted an opportunity to renegotiate lease terms and obtain a large bonus payment.

On January 13, 1984, the Assistant Secretary for Indian Affairs (Operations), pursuant to personal jurisdiction over the Rose appeal authorized by the Secretary of the Interior under 43 C.F.R. § 4.5(a)(1), issued the Department's final decision, holding that: (1) the communitization agreement, to the extent that it included the Rose 80–acre tract as leased lands, was not in the best interests of the Rose lessors when approved by the Area Director, (2) it is not

now in the best interests of the Rose lessors to have their tract of land included in the communitization agreement as leased lands, (3) as to the Rose 80–acre tract, approval of the communitization agreement is reversed, (4) therefore, the Shell lease (on the Rose 80–acre tract) has expired, and (5) as unleased restricted Indian land within the unit, the Rose lessors are entitled to an 8/8th royalty under the terms of the Communitization Agreement. (R., Vol. II, Tab 12, pp. 1–2). The decision-order further directed that the Rose Indian owners were entitled, under the terms of the communitization agreement, to receive 12.65 percent of the value of any production already taken from the unit area plus proper interest and to receive payment for future production at the same rate until such time as the tract is leased or other arrangements are made. *Id.* at p. 5.

Cotton completed the drilling operations on the unit well prior to December 31, 1983. Total drilling and completion costs amounted to $7,765,462.63, while production revenues to that date, after payment of severance taxes, amounted to $407,317.91.

### *Factual Analysis–Discussion*

On May 2, 1983, Mr. John W. Fritz, Deputy Assistant Secretary–Indian Affairs (Operations), declined to decide the Rose appeal from the Anadarko Area Director's decision of February 11, 1982, approving the communitization agreement submitted by Cotton. Rather, Fritz remanded the matter to the Anadarko Area Director with instructions to prepare and forward a written determination on whether approval of the unit agreement was in the best interests of the Rose allottees under this court's *Kenai Oil and Gas, Inc. v. Department of the Interior,* 671 F.2d 383 (10th Cir.1982) opinion and in accordance with the Deputy Assistant's Memorandum of April 23, 1982.

The Memorandum, which was sent to all BIA Superintendents and Area Directors, set forth the guidelines for the approval of communitization agreements. The memorandum provided in part:

> [The] recent decision of the 10th Circuit Court of Appeals in *Kenai* * * * pro-

vides us with some guidance on the scope of * * * [BIA's] authority [to approve communitization agreements of Indian oil and gas leases]. Therefore, the following guidelines have been developed to assist Area Directors and Superintendents in exercising this authority.

*    *    *    *    *    *

2. The Secretary has the discretion to approve or disapprove Communitization or Unit Agreements based on a determination of whether approval would be in the best interests of the Indian lessor. *Area Directors and Superintendents must prepare such a determination in writing, based on logical engineering and economic facts, whether the agreement is approved or disapproved,* and that document should be given to the applicant and the Indian lessor. In determining whether the agreement is or is not in the best interest of the Indian lessor, the following should be considered:

a) The long term economic effects of the agreement must be in the best interest of the Indian lessor and we must be able to document these effects.

b) The Minerals Management Service is required to recommend approval or disapproval based upon the engineering and technical aspects of the agreement to assure protection of the interests of the Indian lessor, and BIA officials should rely on that recommendation.

c) *The lessee in question must have complied with the terms of the lease in all respects, including the commencement of drilling operations, or actual drilling, or actual production in paying quantities (depending on the terms of the lease), within the unit area prior to the expiration date of any Indian lease.*

d) Central office must approve any format of a Communitization Agreement developed by an Agency or Area Office before implementation.

e) Applications to form Communitization Agreements should include an affidavit certifying that all Indian mineral owners have been given notice of the pending action. * * *

f) The party applying for approval of a Communitization Agreement may be requested to provide copies of farm out or similar type agreements in cases where such agreements could have a bearing upon the ownership of the working interest in the unit (emphasis supplied).

(R., Vol. I, Tab 91, Plaintiffs' Exhibit C).

On June 22, 1982, notice was given that the above guidelines were adopted on April 23, 1982. This notice was published in the Federal Register, 47 FR 26920. The explanatory policy stated:

**SUPPLEMENTARY INFORMATION:** It is the intent of the BIA that in exercising the Secretary's discretionary authority to approve or disapprove communitization or unit agreements, BIA officials should take into consideration the Indian owners' best interests and consider all of the factors, including economic consideration, as prescribed by the U.S. Court of Appeals in its decision in *Kenai Oil and Gas, Inc. v. Department of the Interior,* 671 F.2d 383 (February 17, [10th Cir.] 1982). In that decision the Court of Appeals held that the Superintendent of the Uintah and Ouray Agency properly exercised his judgment and discretion in refusing to approve proposed communitization agreements based upon a finding that they did not serve the best economic interests of the Indian lessors. The Plaintiff had argued that the Superintendent's considerations were limited to considering matters involving production and conservation on restricted Indian lands. The Court concluded that the Secretary, acting in his capacity as a trustee, has the responsibility to manage Indian lands so as to make them profitable for the Indian and to maximize lease revenues. *Accordingly, the new guidelines require that in the future BIA Area Directors and Superintendents must prepare a written determination, based upon logical engineering and economic facts, that a proposed agreement is in the best interests of the Indian lessor.* The guidelines also require that the long term effects of the lease agreement must be in the best interests of the Indian

lessor and these effects must be documented.

The Bureau is aware that the process of reaching the determinations required by the guidelines will require that Area Directors and Superintendents. receive proposed agreements sufficiently in advance of the expiration of the primary term of any Indian lease within the proposed unit in order to conduct an adequate review of the engineering and economic factors involved.

Consequently, in order to ensure adequate consideration, lessees of Indian lands are encouraged to submit all future communitization agreements to the appropriate Bureau of Indian Affairs office not less than 90 days prior to the date of expiration of the first Indian lease in the proposed unit (Emphasis supplied).

On July 7, 1983, the Anadarko Area Director submitted a Memorandum to the Deputy Assistant Secretary—Indian Affairs (Operations) detailing, in accord with the aforesaid guidelines and the Assistant Secretary's request of May 2, 1983, the basis and rationale for the Area Director's decision of February 11, 1982, approving the subject communitization agreement. (R., Vol. II, Tab 36). This memorandum set forth important chronological facts worthy of repetition:

(1) The subject 80–acre tract in Section 6, T7N, R.9W., Caddo County, Oklahoma, was duly advertised for Lease Sale December, 1978, by the Anadarko Agency and approved for a bonus of $11,021.60 plus a 20% royalty on BIA Lease Form to Shell Oil Co. on January 17, 1979, for a three year term to January 17, 1982. The Lease, in Section 11 provided:

Unit Operation—The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area affecting the leased lands, or any pool thereof, if and when collectively adopted by the majority operating interest therein and approved by the Secretary of the Interior during the period of supervision.

(2) In May, 1975, the Oklahoma Corporation Commission, by Order # 113637, established a 640 acre spacing unit, providing for drilling of only one gas well in Section 6 to the common source of supply (Treating production from that well as proportionally attributable to all lands in Section 6).

(3) Leasing in Section 6 commenced in January, 1977, continuing through October, 1981. With the exception of a 40 acre tract, all other land in Sec. 6 was Indian owned.

(4) On December 20, 1981, a unit well was commenced in Sec. 6 on lands other than the Rose lease.

(5) On January 13, 1982, the Mineral Management Service (MMS) transmitted the communitization agreement to the Anadarko Agency, recommending approval, while the Indian leases were still within primary terms, finding, *inter alia:*

The Commissions hold hearings and secure testimony from expert witnesses as to the best well spacing for the reservoir using known or available geological and engineering data. Since the State Commission cannot pool Indian lands into an established spacing unit, joinder of the Indian tract(s) is achieved by a CA approved under the terms of the lease. If proper reservoir spacing were not followed, the reservoir would be developed under the simple rule of capture. This has a long-term result of lower ultimate recovery of oil and/or gas (to the detriment of all interests). There may be times when spacing is not in the best interests of a particular individual in the short-term; but, the determination to communitize must be based upon the long-term overall conditions of the reservoir.

(6) On January 15, 1982, the Anadarko Agency Superintendent transmitted the Communitization Agreement to the Anadarko Area Director's office recommending approval.

(7) Newton Rose, for himself and representing the Rose interests in the 80 acre tract, requested that the Area Director not approve the Communitization Agreement and expressed the hope that the Rose lease be permitted to expire and then open for new leasing.

(8) On January 19, 1982, the Area Director telephoned the MMS office and requested that he be provided additional information relative to Communitization. The MMS responded on January 22, 1982, and noted that the well being drilled on the unit had been drilled to a depth below 5200 feet and that drilling operations were continuing.

(9) On January 22, 1982, the attorney for Newton Rose, et al., requested that the proposed communitization agreement be transmitted to the Department's Washington, D.C. office for review prior to final action. [The Area Director approved and signed the Communitization Agreement on February 11, 1982, and the Rose defendants appealed the approval to the Deputy Assistant Secretary for Indian Affairs].

(10) On February 2, 1982, the operator reported a drilling depth of 10,223 feet.

In the Area Director's "Conclusions," he observed, *inter alia,* that: the communitization agreement had been received prior to expiration of the Indian leases and commencement of drilling operations within the unit area was within the primary terms; the primary purpose for leasing constitutes an agreement between lessor(s) and lessee(s) whereby the ultimate goal is production through joint effort; commencement of the unit well in December, 1981, indicated probability of achievement; the isolation of or separation of the Rose 80–acre tract from the 640 acre unit for development from the other leaseholds within the spacing pattern, did not appear probable or feasible; the Corporation Commission may enforce a denial of requests for increased densities or effectively control well spacing by refusing permits authorizing the sale and/or purchase of oil and gas; most oil companies would be reluctant to carry an unleased tract because of the costs involved in drilling the spacing pattern, and it is unlikely that an oil company would be interested in drilling the second well when it has been determined that the common source of supply may be drained by one well. (R., Vol. II, Tab 36).

Under the caption of "General Discussion" the Area Director observed that: Generally, Indian mineral owners do not object to communitization, per se, but rather object where the end of a primary term of a lease is in sight and a new lease may result in substantially larger bonus; the official having the responsibility of approving communitization agreements must weigh all factors, including that of orderly development and uniform sharing, in reaching a decision which will benefit the Indian mineral ownership; the March, 1982, top bid for Indian tracts anywhere near Section 6 was $1,375.00 per acre. *Id.*

The record reflects that of all the Indian leases in Sec. 6, the Rose lease is the only Indian lease which administratively challenged the February 11, 1982, approval of the communitization agreement by the Anadarko Area Director.

On August 17, 1983, the Rose family requested the Interior Board of Indian Appeals (IBIA) to assume jurisdiction of their appeal under 25 C.F.R. § 2.19 because no decision had yet been issued. Before the IBIA assumed jurisdiction, the Secretary of the Interior assumed jurisdiction over the Rose appeal and delegated his decision-making authority to the Assistant Secretary for Indian Affairs.

On January 13, 1984, the Assistant Secretary for Indian Affairs rendered a final decision in the administrative chain of this case. Without any recognition of the mandates of his own guidelines which were carefully followed by the Area Director in his July 7, 1983, memorandum, the Deputy Assistant Secretary found:

(1) the communitization agreement, to the extent that it included appellants' (Rose, et al.) tract as leased lands, was not in the appellants' best interest when approved by the Area Director;

(2) at this time it is not in the best interest of appellants to have their parcel included in the communitization agreement as approved by the Area Director as leased lands;

(3) as to that tract, approval of the communitization agreement is reversed;

(4) therefore, the Shell lease has expired; and

(5) as unleased restricted Indian land within the unit, the appellants are enti-

tled to an 8/8th royalty under the terms of the communitization agreement. (R., Vol. II, Tab 12).

Further the Assistant Secretary instructed the Area Director:

I also instruct the Area Director that until such time as the Rose tract is included in a new oil and gas lease, it is deemed to be unleased land within the communitized area and, therefore, the Indian owners are entitled under the terms of the agreement to receive 12.65 percent of the value of any production already taken from [the unit area] plus proper interest and are entitled to receive payment for future production at the same rate until such time as the tract is leased or other arrangements are made....

*Id.* at p. 5.

In granting summary judgment in favor of the defendants, the Secretary and Newton Rose, et al., the district court found that the Assistant Secretary's decision overturning the Area Director's approval of the communitization agreement as to the Rose lease was within the broad discretion vested in him under 43 C.F.R. § 4.5(a)(1) and our *Kenai* opinion and that it was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The court found, *inter alia:*

[T]here is adequate support for finding that the Assistant Secretary considered all relevant factors and made no clear error of judgment in overturning the decision of the Anadarko Area Director.

\*   \*   \*   \*   \*   \*

In this case, the Assistant Secretary's ruling articulates his findings and analysis for determining the agreement was not in the Rose family's best economic interests.... His rationale is supported by evidence in the record.

(R., Vol. I, Tab 120, p. 8).

## *Appellate Contentions*

On appeal, Cotton contends that (1) the Secretary erred, as a matter of law, in refusing to approve the geologically prudent communitization agreement for the sole purpose of causing the Rose lease to expire, (2) the Area Director had the au-thority to approve the communitization agreement at any time after it had been properly and timely submitted by Cotton, (3) the Secretary's order was arbitrary and capricious because his analysis consisted of a consideration of the merits of the Rose lease, (4) the Secretary's order was arbitrary and capricious and contrary to law because his decision placed the Rose lease both inside and outside the unit, and (5) the proceeds of production must be paid to a party who has expended funds to develop an oil and gas well under an invalid or expired lease until his costs have been recouped.

Both the Rose appellees and the Secretary, on appeal, argue that the Rose lease had expired by its own terms before the communitization agreement was approved and that Cotton, as operator of the gas production unit, is not entitled to recover all production costs for the unit attributable to the restricted Indian (Rose) tract until the Secretary so orders. The Secretary argues that this court lacks jurisdiction over this appeal from the district court's order remanding the case to the Secretary for further action.

## I.

### *Our Jurisdiction*

We shall first consider the Secretary's contention that this court lacks jurisdiction over this appeal. In every case and at each stage of the proceeding, we must satisfy ourselves that our jurisdiction is proper. *Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857, 859 (10th Cir.1986).

The Secretary acknowledges that while the district court's order of November 3, 1986, did resolve the threshold legal issues, i.e., whether the Rose lease had expired and whether it was part of the unit, still the order was not final because the district court remanded to the Secretary to determine how an equitable lease should be negotiated and what bonus the Rose family should receive, after which any remaining funds (from production) should be redistributed to Cotton. The Secretary points out that on remand, he must determine Cotton's rights, as unit operator, to recoup its

production costs attributable to the Rose tract. This determination depends upon Cotton's status as a "good faith trespasser," which must be resolved by the Secretary on remand. Thus, argues the Secretary, the district court's order of January 13, 1984, is not a final, appealable order. This court has held that for a decision to be final under 28 U.S.C. § 1291, "it ordinarily must dispose of the litigation on the merits." *Jesko v. United States*, 713 F.2d 565, 567 (10th Cir.1983).

The Secretary correctly states that remand to an administrative agency by the district court is ordinarily not a final decision, citing to *Bender v. Clark*, 744 F.2d 1424, 1426–27 (10th Cir.1984). That opinion, however, is authority for the proposition that the finality requirements of 28 U.S.C. § 1291 (final decision) need not strictly come within the *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) "collateral order" doctrine if, in a practical sense, justice may require immediate review. In *Bender*, we opined:

> [T]hus, in the unique instance where the issue is not "collateral" but justice may require immediate review, a balancing approach should be followed to make this jurisdictional decision.
>
> The circumstances ... require the application of such a balancing test rather than the mechanical analysis of the collateral order doctrine. The critical inquiry is whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review.

744 F.2d at 1427.

We hold that the issues presented in this appeal are of such importance that any delay in review by this court would likely result in further disputes and litigation, confusion and danger of injustice. The doctrine of ripeness requires us to evaluate both the fitness of the issues for judicial decision and the hardship of the parties of withholding court consideration. *In Re Grand Jury, April, 1979*, 604 F.2d 69, 72 (10th Cir.1979).

## II.

### *The Rose Lease Expiration Contention*

■ Both the Rose appellees and the Secretary argue that the Rose lease expired by its own terms before the communitization agreement was approved by the Area Director. We disagree.

Both in his brief and during oral argument, the Secretary contended that because the primary term of the Rose lease expired before the Area Director approved the communitization agreement, the Secretary may determine that it is in the best economic interest of the Rose lessors to recognize the fact that the lease has expired and for the Secretary to approve the communitization agreement of that tract as "unleased land." (Brief of Appellee Secretary, pp. 15–16).

The Assistant Secretary, in issuing his January 13, 1984, decision reversing the Area Director's order approving the communitization agreement, specifically recognized that the communitization agreement had been timely submitted for approval:

> ■ The first factor pertains to the timeliness of the submission of the agreement to the Bureau for approval. Obviously, a proposed agreement <u>must be submitted prior to the expiration of the primary term of an Indian lease if that lease is to be included in the proposed unit. Indeed, the agreement in issue was submitted only four days before the expiration date of Shell's lease....</u> (underlining supplied).

(R., Vol. II, Tab 12, p. 2).

Thus, the Secretary found that the communitization agreement had in fact been timely submitted by Cotton to the Bureau for approval. This is buttressed by the fact that the Assistant Secretary, after so finding, proceeded to analyze what he considered to be the merits of the case in determining the best interests of the Rose lessors. In his brief, the Secretary states: "The issue in the instant case is not whether Cotton was timely in the submission of the communitization agreement, but whether it was in the best interest of the Rose family." (Brief of Secretary, p. 21, foot-

note 9). We agree. The Secretary's finding that the *submission* of the communitization agreement by Cotton to the Department prior to the expiration of the Rose lease's primary term was timely was correct. The Secretary has held that submission of a communitization agreement to the Minerals Management Service affecting Indian lands constitutes delivery to the Department and was timely, rendering the agreement effective as of the date it was *submitted* for approval. (Brief of Appellants, Exhibit F).[1]

The Secretary, on appeal, argues directly opposite his January 13, 1984, ruling that Cotton's submission of the communitization agreement was timely: "The lease expired because *Cotton* failed to do any one of three things which, by the lease's own terms, would have extended the life of the lease: production in paying quantities; commencement of drilling on the lease; or approval during the primary term of an unit agreement and commencement of drilling within the unit." (Brief of Secretary, p. 15).

In this case, the Secretary's authority to approve the communitization agreement had been delegated to the Anadarko Area Director of the Bureau of Indian Affairs. Cotton *submitted* the communitization agreement in a *timely* manner. A matter is properly "submitted" when it is left to the determination or decision of another. *See People v. Terry*, 2 Cal.3d 362, 85 Cal. Rptr. 409, 417, 466 P.2d 961, 969 (1970). A matter is "timely" when it is seasonable or opportune. *United States ex rel Martin v. Murphy*, 208 F.Supp. 562, 564 (D.C.N.Y. 1962). It's *approval* required a three-step

process. On January 12, 1982, the communitization agreement was approved by the Department's Minerals Management Service, thus completing the first step. It was then forwarded to the Superintendent of the Anadarko Agency, who in turn approved the agreement and on January 15, 1982, forwarded it to the Anadarko Area Director, thus completing the second step. Thus, the process of approval of the communitization agreement had been completed in steps one and two, two days prior to expiration of the primary term of the Rose lease. The Area Director was contacted by Newton Rose prior to the expiration date of the Rose lease and requested not to approve the agreement. The Area Director thereupon requested additional information, delaying his approval of the communitization agreement until February 11, 1982.

It is to be noted that there are no time restrictions or limitations involving the decisions to approve or disapprove communitization agreements at any of the procedural stages above identified. Furthermore, the record does not reflect that Cotton was requested to supply additional documentation in support of its initial submission. Accordingly, any delays could not be attributed to Cotton.[2]

We have observed, however, that after the Area Director received the communitization agreement from the Superintendent *prior* to the expiration of the primary term of the Rose lease, he was contacted by Newton Rose and requested to disapprove the agreement. The Area Director did withhold his approval of the communitization agreement until February 11, 1982,

---

**1.** By analogy, we note that in *Hallam v. Commerce Mining & Royalty Co.*, 49 F.2d 103 (10th Cir.), *cert. denied*, 284 U.S. 643, 52 S.Ct. 23, 76 L.Ed. 547 (1931), this court held that the Secretary's approval of a mining lease on restricted Indian land related back to the date of the lease. We there observed the broad powers vested in the Secretary, including the power to suspend his regulations. *Id.* at 108. The "relation back" doctrine applied in *Hallam* was likewise applied in *Hood v. United States*, 256 F.2d 522 (9th Cir.1958) wherein the court held that the Secretary of the Interior's approval of conveyance by deed of restricted Indian land on August 10, 1926, related back and became effective as of

the date of the deed executed on November 10, 1925. *Id.* at 529.

**2.** In *County of Sullivan v. Civil Aeronautics Board*, 436 F.2d 1096 (2nd Cir.1971), Judge Friendly, in a case involving an application for renewal of a license, held that "[i]f the licensee has timely sought renewal, the valuable rights conferred by the license for a limited term shall not be lost simply because the agency has not managed to decide the application before expiration of the existing license." *Id.* at 1099. By analogy, the valuable rights conferred by the lease to Cotton for the limited term should not be lost where Cotton timely submitted for approval the communitization agreement.

which was after the expiration of the primary term of the Rose lease. It seems likely, in light of the Area Director's decision to approve the communitization agreement, that absent the intervention of Newton Rose, the Area Director would have approved the agreement prior to the expiration date of the Rose lease. This, in turn, may have been sufficient to bring into play the equitable application of the tolling doctrine. *See Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1341 (10th Cir.1982).

In *Appeal of Integrity Oil and Gas Co.*, 42 IBLA 222 (August 22, 1987), a communitization agreement was approved by USGS on April 18, 1979, and backdated to effective date of October 1, 1978, thus qualifying the subject federal oil and gas lease which had an expiration date of October 31, 1978, to a two year extension. In the case at bar, the effective date of the communitization agreement was November 20, 1984 (R., Vol. II, Tab 63).

Newton Rose, et al., consistently argued to the Secretary that the main issue in this case is whether the Area Director was empowered to revive an expired oil and gas lease by communitizing Indian lands after the expiration of the lease. The Secretary, however, did not initially accept the Rose arguments that the lease had expired. Rather, the Secretary remanded the matter to the Area Director for his determination of whether the communitization was in the best interest of the Rose lessors. Thereafter, on appeal from the remand approval of the communitization agreement by the Area Director, the Secretary addressed the merits of the case. In so doing, the Secretary concluded that the Rose lease had expired.

In apparent reliance of his erroneous ruling that the Rose lease had expired at the end of its primary term, the Secretary proceeded to insert the Rose land, as an "unleased" tract within the unit. The result: the Rose 80–acre tract was, by order of the Secretary, entitled to a full 8/8th share of production proceeds from the Cotton well on the unit as "unleased Restricted Indian land" until the land be re-leased or its ownership established. (R., Vol. II, Tab 63, p. 2).

Cotton argues that the Secretary cannot have it "both ways," in that the Secretary's choice was that of recognizing the validity of the Rose lease and placing it in the unit subject to the approved communitization agreement or not placing it in the unit for purposes of the communitization agreement, in which case the lessors would not be lawfully entitled to share in the unit revenues. (Brief of Appellant, p. 41).

## III.

### Our Disposition

Even though title has been distributed to an individual Indian allottee in order to qualify as allotted lands, the Secretary of the Interior nevertheless serves as a trustee in relation to oil and gas leases covering such lands, over which he has been held to have control. *See Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968). The Congress has vested the Secretary with wide discretion in the leasing and development of all lands allotted to Indians. 25 U.S.C. § 396 provides, *inter-alia:*

All lands allotted to Indians in severalty, except ... may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary is authorized to perform any and all acts and to make such rules and regulations as may be necessary for the purposes of carrying the provisions of this section into full force and effect.

Under this statute, restricted allottees may lease their land with the consent and subject to terms approved by the Secretary of the Interior. The Secretary has promulgated various regulations governing operations and production applicable to leases of restricted Indian lands. 25 C.F.R. 212.24(c) specifically provides that leases of restricted Indian lands are subject to cooperative or unit development plans when approved by the Secretary. 25 C.F.R. 212.24(b) provides that the Secretary may impose such restrictions as to time or times for the drilling of wells and as to the production from any well or wells on restricted Indian lands which may be necessary, in his judg-

ment, for the protection of the natural resources of the leased land and in the interests of the Indian lessor. Thus, the Secretary must consider the conservation factor. In *Phillips Petroleum Co. v. Peterson*, 218 F.2d 926, 932–33 (10th Cir.1954), *cert. denied*, 349 U.S. 947, 75 S.Ct. 871, 99 L.Ed. 1273 (1955), we observed:

> After all of the parties have consented to the agreement, either by executing it, or a counterpart thereof, or by consent and commitment pursuant to a unitization clause such as § 12, the unit plan is submitted to the Secretary or his authorized agent for final approval, which is by certificate upon a determination that such agreement is necessary and advisable in the public interest and is for the purpose of more properly conserving natural resources.

> Thus, it will be seen that unitization is a conservation measure which benefits both lessor and lessee and tends to prevent waste of a natural resource.

> \* \* \* \* \* \*

> The practice of unitization by a power granted the lessee in advance, if faithfully carried out, will be fair and profitable both to the lessor and lessee, and is vital to the oil and gas industry in the interests of the conservation of both natural and material resources. It should be upheld, although the grant of power is in general terms, because it is subject to implied terms that will prevent arbitrary and unfair dealing, will require compliance with the implied covenants in the lease for the benefit of the lessor and will impose a rigid standard of good faith on the part of the lessee.

The Secretary's decision reversing the Area Director's remand approval of the communitization agreement timely submitted by Cotton is discretionary action subject to judicial review to determine whether the Secretary acted in a manner that was arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A). The district court conducted its review under this standard, but did not find, as we must, that the Secretary failed to discuss or analyze all of the relevant factors required in reaching his decision, mandated under his guidelines to all Superintendents and Area Directors. In *Kenai*, we observed that "[I]f the Superintendent considered all relevant factors in reaching his decision and made no clear error of judgment, his action cannot be overturned." 671 F.2d at 386. The same standard was applied in *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), where the Court observed that it is required to determine "[w]hether the decision was based on a consideration of all the relevant factors and whether there is a clear error of judgment."

Significant to this appeal, the Assistant Secretary *did not* discuss or analyze the various factors required under the guidelines set forth in his memorandum of April 23, 1982, issued to all BIA Superintendents and Area Directors. He *did not* (a) assess the long term economic effects of the communitization agreement in relation to whether it would be in the best interest of the (Rose) Indian lessor, nor was any attempt made to document this matter, (b) rely upon or give any reasons for not relying on the recommendation of the Minerals Management Service approving the communitization agreement based upon expert geologic and engineering opinions as serving the best interests of the Indian lessor, and (c) assess whether the lessee had complied with the terms of the Rose lease in all respect. Instead, the Assistant Secretary purported to dispose of the Rose appeal "[o]n the narrow question of whether approval of the communitization agreement was in appellants' best interest. . . ." (R., Vol. II, Tab 12, p. 2).

Thus, the Assistant Secretary predicated his decision simply upon the "narrow question" that by his disapproval of the communitization agreement *only* as it relates to the Rose lease, thus effecting a termination thereof, he would serve the "best interest" of the Rose appellants in the "economic" sense set forth in *Kenai Oil & Gas, Inc. v. Dept. of Int. of U.S., supra*, based upon the likelihood of an enhanced bonus payment and greater reserved royalty under a new lease. The Assistant Secretary acknowledged that development of the Rose tract as a separate or isolated tract within

the 640–acre unit was probably not economically feasible. (R., Vol. II, Tab 12, p. 3)[3]. In thus proceeding, the Assistant Secretary violated the mandates of his own guidelines. He did not recognize or discuss any obligation to approve the agreement there may be by virtue of the express language contained in Par. 11 of the Rose lease. He was clearly obligated to analyze and discuss the long term economic effects of the communitization agreement on the Rose lessors and to reason on the engineering and technical aspects of the unit and the communitization agreement covering it insofar as it assures the best protection to the interests of the Rose lessors. There is no discussion or analysis of these factors in the Assistant Secretary's decision. An administrative agency must explain its departure from prior norms (guidelines). *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Secretary of Agriculture v. United States,* 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954). Here, the Assistant Secretary did not address the very factors required under the guidelines he issued and he made no effort to explain his failure to do so.

Where it is shown that an administrative agency deviated from its established procedures, the presumption of administrative regularity does not apply. *Wilson v. Hodel,* 758 F.2d 1369 (10th Cir.1985). The Assistant Secretary issued the April 23, 1982, guidelines following the *Kenai* opinion handed down by this court. While *Kenai* rejected the contention that the decision relative to approval of a communitization agreement should be confined to matters of conservation and production (or geologic and engineering expertise) relating to the unit, it did hold that the decision-maker must consider *all factors* affecting the Indians' best interests.

In the instant case, it has been noted that all of the lands leased in Section 6 with the exception of a 40–acre tract are Indian

owned. The Assistant Secretary's decision in this case was anchored to the potentially large bonus the Rose family likely would receive for a new lease once the Secretary disapproved the communitization agreement as it applied to the Rose 80–acre tract, coupled with the order that because the Rose lease had expired (upon the Assistant Secretary's disapproval of the communitization agreement *only* as to this tract), the lessee (Cotton by assignment) must, under the terms of the communitization agreement, pay the Roses a full 8/8th of production attributable to the 80–acre unleased tract in the unit or 12.65 percent of the total production from the Cotton well. In *Cheyenne & Arapaho Tribes of Western Oklahoma v. Deputy Ass't Secretary–Indian Affairs, et al.,* 12 IBIA 241, 91 I.D. 229, 234 (May 22, 1984), the Board of Indian Appeals affirmed an Acting Area Director's decision approving a communitization agreement (after *Kenai*) on the grounds that:

If proper reservoir spacing were not followed, the reservoir would be developed under the single rule of capture. This has a long-term result of lower ultimate recovery of oil and/or gas (to the detriment of all interests). There may be times when spacing is not in the best interests of a particular individual in the short-term; but, the determination to communitize must be based upon the long-term overall conditions of the reservoir.

\* \* \* \* \* \*

We are of the opinion that a uniform policy of refusing to approve communitization agreements in logically spaced areas solely for the reasons that the mineral owners *might* receive additional revenues will eventually diminish the sale of Indian land leases and will not be in the best long term interests of the Indians.

The Assistant Secretary in the case at bar did not analyze or discuss—or ever recognize—the possible adverse effect that

---

3. Indeed, where a small tract owner has been afforded a fair chance to join in a fair unitization agreement (and in this case, there is no contention that the communitization agreement submitted by Cotton is unfair) with an equitable opportunity to ratably participate in the pooled drilling unit, no permit to drill on the small tract will be granted. *See* 6 Williams and Meyer, Oil and Gas Law, § 933.6 (1987).

his decision on behalf of the Rose appellants could or likely might have on the Rose family or on the remaining Indian land owners in relation to long-term mineral development. The Secretary refers to Cotton's contention that his action in disapproving the communitization agreement only as it applied to the Rose tract was taken for the sole purpose of causing the Rose lease to expire as "impassioned rhetoric," because:

[t]he Secretary did not cause the lease to expire by reversing the Area Director's decision; he merely recognized what had already happened—the lease had expired of its own terms on January 17, 1982. The lease expired because Cotton failed to do any one of three things which, by the lease's own terms, would have extended the life of the lease: production in paying quantities; commencement of drilling on the lease; or approval during the primary term of an unit agreement and commencement of drilling within the unit.

(Brief of Appellee Secretary, pp. 14–15).

The Secretary was clearly wrong in holding, as the Rose appellees had urged, that the Rose lease expired at the end of its primary term.

In this case, relevant factors do involve the economic effects of the communitization agreement on the Rose lessors but also on many other Indian lessors with lands in the 640–acre unit. In any event, as previously discussed herein, the Secretary simply failed to set forth, discuss and analyze all of the factors his own guidelines and our *Kenai* opinion required of him. The Secretary did not articulate the grounds for his decision or the essential facts upon which it is made. *Dunlap v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). On the other hand, the Area Director did comply with these mandates. *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct"); *Graphic Communications International Union v. Salem–Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C.Cir.1988) ("Agency de-

cisions that depart from established precedent without a reasoned explanation will be vacated as arbitrary and capricious").

The Secretary's abuse of discretion is further established by the inconsistencies within the Assistant Secretary's ruling itself. In one sentence, the ruling disapproves the communitization agreement for the express purpose of causing the underlying lease to expire: "[A]s to [the Rose] tract, approval of the communitization agreement is reversed." (R., Vol. II, Tab 12, p. 1.) In another sentence, the ruling approves the agreement and orders that the Rose tract be placed in the unit and be given royalties under the very agreement that had just been disapproved: "[A]s unleased restricted Indian land *within the unit,* the appellants are entitled to an 8/8th royalty *under the terms of the communitization agreement." Id.* at 2 (emphasis added). To reject the communitization agreement and then immediately to affirm it and to award the Rose appellees retroactive benefits under it exposes the arbitrary and capricious nature of the Secretary's action.

In addition, the Assistant Secretary's ruling is inconsistent in its treatment of the other Indian lessors in the same unit area. As noted above, the Rose appellees own only a portion of the mineral interests in the unit, and nearly all of the other tracts are owned by other Indian lessors. As to the tracts of the other Indian lessors, for whom the Secretary owes an equivalent fiduciary responsibility, the Secretary *approved* this very communitization agreement (through his delegate, the Area Director). The Assistant Secretary rejected the communitization agreement as to the Rose tract alone. The Assistant Secretary gave no adequate and reasoned explanation for inconsistent treatment of similarly situated Indian lessors under the identical communitization agreement.

Finally, the Assistant Secretary's ruling is inconsistent with the Secretary's prior approval of the lease between the Rose appellees and the oil company. Three years earlier, the Secretary approved that lease as being in the best interest of the

Indians. (R., Vol. II, Tab 74, p. 3.) Implicit in that approval was the Secretary's approval of the parties' express promise to abide by any communitization agreement adopted for the unit and approved by the Secretary. This does not mean that the Secretary forfeited his right to examine the appropriateness of a proposed communitization agreement. It does, however, provide additional proof that the Secretary was acting arbitrarily and capriciously when he thereafter refused to approve an otherwise fair and proper communitization agreement for the *sole purpose* of causing the underlying lease—which the Secretary had previously approved—to expire.

Here, neither the Secretary nor any other government office reviewing the communitization agreement found any fault with it. There was no substantial argument that the communitization agreement was not fair, or that the Rose appellees were not getting the economic benefits under it for which they had bargained. Instead of evaluating the communitization agreement on its merits, the Secretary used its rejection as a triggering event to cause the termination of a separate instrument, the lease. *See, e.g., Green Country Mobilephone, Inc. v. Federal Communications Commission,* 765 F.2d 235, 237 (D.C.Cir.

1985) ("We find that the Commission has not treated similar cases similarly.... A 'sometimes-yes, sometimes-no, sometimes-maybe policy ... cannot ... be squared with our obligation to preclude arbitrary and capricious management of [an agency's] mandate.'") (quoting *NLRB v. Washington Star Co.,* 732 F.2d 974, 977 (D.C.Cir.1984)).[4]

We see no reason to remand this matter for further consideration by the Secretary as suggested by Judge McKay in his dissent.[5] The facts were fully developed in the record and are largely undisputed. The Secretary cannot cure the fundamental inconsistencies discussed above and still preserve the Rose appellees' clear economic interest in remaining in the unit without reinstating the Area Director's decision, which was reasoned and consistent. *See generally Gatson v. Bowen,* 838 F.2d 442, 450 (10th Cir.1988) (court reverses Social Security determination without remanding case back to the agency for further findings because no purpose would be served by a remand for further findings where the record sufficiently established disability); *Byron v. Heckler,* 742 F.2d 1232, 1236 (10th Cir.1984) (remand to agency for further findings held not necessary because

---

4. Our decision in *Kenai,* 671 F.2d 383 (10th Cir.1982) is not to the contrary. There, the Secretary (through his delegate, the Superintendent of the BIA) was not taking inconsistent positions as to whether the Indian lessor was in or out of the communitization unit. Rather, the Secretary in *Kenai* refused to approve the communitization agreement for any purpose. We were not faced there with a situation where the Secretary was seeking simultaneously to free the Indian lessor from the burdens of the communitization agreement while retaining for the Indians its benefits. Additionally, the lessee in *Kenai* acted much less diligently than did the lessee here. In *Kenai,* the lessee had ten years to drill a producing well on the property and did not do so. 671 F.2d at 384, 388 n. 3. Here, in contrast, the Secretary acknowledged that the lessee had "acted diligently" with respect to the three-year Rose lease. (R., Vol. II, Tab 12, p. 1.) Moreover, unlike *Kenai,* the record here clearly established that, from a geological and engineering point of view, the communitization agreement was beneficial to the Rose appellees and to the other Indian lessors in the unit. In addition, here we have a finding by the Area Director, who ordinarily is the final decisionmaker concerning the merits of communitization

agreements, approving the agreement in a reasoned manner.

5. The dissent cites *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), for the proposition that the "most we can do under [these] circumstances is to remand for consideration of all relevant factors." We do not think that *Camp* goes that far. *Camp* merely holds that a district court charged with reviewing an agency's decision for abuse of discretion should not conduct a *de novo* hearing, but rather should rely on the facts and reasoning developed in the administrative record supplemented by such additional affidavits or testimony as may be necessary to explain the agency decision. *Camp* contemplates a remand when "further explanation is necessary to a proper assessment of the agency's decision." *Id.* at 143, 93 S.Ct. at 1244. But the problem here is not that further explanation is necessary. The record makes it very clear why the Assistant Secretary disapproved the communitization agreement. Rather, the problem here is that the Assistant Secretary's proffered explanation and his ruling are inconsistent and arbitrary. *Camp* does not speak to that issue.

"it is highly doubtful that there would be substantial evidence in the record [on remand] to support a finding that appellant's condition had improved to the requisite extent").

On the totality of the record before us, we conclude that the Secretary's rejection of the Area Director's decision constituted an abuse of discretion and that the Area Director's reasoned judgment should be reinstated. Accordingly, we REVERSE the order and judgment of the district court and we REMAND the case to the district court with instructions to reverse the orders of the Assistant Secretary, to reinstate the decision of the Anadarko Area Director approving the communitization agreement, and to declare that the lease has not expired.

McKAY, Circuit Judge, dissenting:

In my judgment, the court has not properly focused on whose interest the Secretary has a duty to protect. Thus, the court has erroneously overturned the Secretary's exercise of discretion without any support in the law. I therefore must respectfully dissent.

At issue in this case is an eighty-acre tract of restricted Indian allotment land owned by Newton Rose and others. The Rose tract was leased to Shell Oil Company on January 17, 1979. Shell assigned the lease to Cotton Petroleum. The three-year lease term was to expire on January 17, 1982, unless Cotton did one of three things to extend the life of the lease: (1) produce oil or gas in paying quantities; (2) commence drilling on the lease; or (3) secure approval during the primary term of the unit agreement and commence drilling within the unit. Cotton failed to meet any of the lease-extending terms. Nine days prior to the lease's expiration, Cotton submitted a communitization agreement for government approval. Cotton knew that the agreement had to be approved by three separate federal agencies. Two of the three agencies approved the communitization agreement prior to the lease's expiration. However, the Assistant Secretary for Indian Affairs, acting pursuant to proper authority from the Secretary of Interior, determined that it was in the best interest of the Indians to allow the lease to expire before approving the communitization agreement. Clearly, the duty of the Secretary in this matter was to act in the best interest of the Rose lessors. The court has, in effect, held that it was in the Indians' best interest not to let the lease expire. Nevertheless, I am unable to find anything in the opinion which persuasively argues that the Secretary abused his discretion by determining that it was in the Indians' best interest to have the lease expire so as to renegotiate the lease and bonus payments. The majority lists various factors including the long-term economic effects of the agreement and not relying on the recommendation of the Minerals Management Service as indicating that the Secretary violated his own guidelines. Given the breadth of the Secretary's discretion, our duty to defer to it, and the burden on the Secretary to act in the best interest of the Indians, I find it totally inconsistent with our cases to suggest that his economic judgment was, as a matter of law, wrong. Moreover, to suggest that, as a matter of law, it was in the Rose lessee's interest to forego the renegotiation of the lease in order to obtain the larger bonus payment turns the deference owed to the Secretary on its head.

If we recognize that the Secretary's duty is to the Rose lessors, then we must also accept that so long as in his considered judgment his action will be to their benefit (whether he is in the end right or wrong), he may do anything which at law may be done in order to protect their interests. Indeed, he is legally bound to do so. It would be an extraordinary proposition indeed to suggest that it would be "arbitrary or capricious" for the Secretary to let a lease expire by its own terms if that would be in the Indians' best interest.

Although the exact basis of the court's opinion is somewhat unclear, it apparently rests, at least in part, on the view that the act of "submitting" the communitization agreement prior to the expiration of the lease constituted "approval" of the agreement, thereby extending the life of the lease. The two cases cited by the majority in support of this view are, at best, of

doubtful authority. Both cases deal with the power of the Secretary to make his post-expiration approval retroactive. Neither holds that the Secretary's post-expiration approval, as a matter of law, constitutes a retroactive decision which saves an expiring lease despite the Secretary's intention otherwise. *See Hallam v. Commerce Mining & Royalty Co.*, 49 F.2d 103 (10th Cir.), *cert. denied*, 284 U.S. 643, 52 S.Ct. 23, 76 L.Ed. 547 (1931); *Hood v. United States*, 256 F.2d 522 (9th Cir.1958).[1] In fact, in *Hallam* we recognized the strong policy of permitting the Secretary the broadest possible powers, including the power to suspend his regulations. *Id.* at 108. The entire thrust of that case was the breadth of the Secretary's power, including the power to relate approval back to the date of submission. *Hallam* is a far cry from the majority's apparent position that the Secretary *has no choice* but to relate approval back in order to revive an expired lease. In my view it is an extraordinary feat to convert the Secretary's broad power to relate an approval back to the date of submission, if doing so is in the Indians' best interest, into a mandate which in effect removes the Secretary's power to permit the expiration of the lease if it does not serve the Indians' interest. Indeed, the tenor of the majority's discussion on this issue appears to be more concerned with what is in the best interest of Cotton Petroleum, the lessee, rather than what is in the best interest of the Indian lessors. I find no authority for such an emphasis anywhere in the law.

The majority faults the Secretary for failing to make the communitization approval retroactive. Yet, the majority itself suggests that the Secretary's decision not to exercise his broad retroactivity discretion was altogether deliberate. As the court notes, the Secretary did not initially accept the Indians' argument that the lease had expired; instead, he remanded the matter to the Area Director for his determination of whether communitization was in the best interest of the Rose lessor. Majority Opinion at 1519. Thereafter, the Secretary concluded that the Rose lease had expired. It therefore is beyond cavil that the Secretary deliberately determined not to exercise his retroactivity authority, but rather to let the Rose lease remain expired. Thus, in concluding that the Secretary should have made the approval retroactive, the majority impermissibly substitutes its judgment for that of the Secretary.

I also disagree with the majority's view that the Secretary violated his own regulations.[2] In my view, the proper analysis requires us to begin with the proposition established in *Kenai Oil & Gas v. Department of Interior*, 671 F.2d 383 (10th Cir. 1982). In that case we made clear that "all communitization agreements on restricted Indian lands must be approved by the Secretary of Interior or his designate, in this case, the Superintendent of the BIA." *Id.* at 384–85. In *Kenai*, the proposed communitization agreement which would have extended the lease was clearly, like the instant case, *submitted* timely to prevent the expiration of the lease. The Superintendent, acting for the Secretary, refused to approve the proposed communitization agreement, resulting in the expiration of the lease. The only difference between this case and that one is that, in *Kenai*, the Superintendent refused to approve the agreement at all. Here, the Secretary simply refused to approve it retroactively.

It seems to me that the majority has turned *Kenai* on its head. The thrust of the *Kenai* decision is that the Secretary

---

**1.** In *Hallam* the court was dealing with an overlapping lease that related back to the date the lease was made. It was not dealing with a lease that had expired prior to the submission of a communitization agreement. In *Hood*, while the court refers to the retroactivity doctrine, it expressly states that "[i]t is probable here that there is no necessity to rely upon the doctrine of 'relation back' to make the approval of the Secretary ... effective." 256 F.2d at 529. Thus,

the *Hood* court understood that the application of retroactivity was not automatic.

**2.** Assuming *arguendo* that the Secretary did violate his own guidelines, it is an unprecedented leap for this court to do something other than remand the case to the Secretary for action in compliance with those guidelines. That is precisely what the majority has done in this case. I cannot agree with the court's conclusion or action in this regard.

acts in a fiduciary responsibility to the Indian lessor, and that judicial review of the Secretary's decision is severely limited. It was in that context that this court held "if the [Secretary] considered all relevant factors in reaching his decision and has made no clear error of judgment, his action cannot be overturned." *Id.* at 386. Indeed, apropos to this case, in *Kenai* we rejected the lessee's two-part argument that the Secretary exceeded the scope of his discretion by basing his decision on economic factors and that the manner in which the Secretary reached his decision was procedurally defective. *Id.*

It is clear that the Secretary precisely followed *Kenai* in this case. He issued regulations which outlined the matters which subordinates should include in their reports to him, so that he could exercise his (not their) discretion in looking after the interests of the Indian lessors. Thus, in this case the Secretary clearly "considered all relevant factors in reaching his decision...." *Id.*

The majority acknowledges that in *Kenai* we rejected the argument that the Secretary's discretion was limited to consideration of specific factors. *See ante* at 1526. Nevertheless, the court now seeks to impose its own set of limitations on the Secretary's decisionmaking process. The majority dwells on the notion that the Secretary must consider *all relevant* factors in reaching his decision and faults the Secretary for failing to do so. However, the record indicates that the Secretary was cognizant of, and his actions were at all times consistent with the Indians' economic interests.

By requiring Cotton to renegotiate the lease at current market rates, and possibly to pay a sizeable bonus to the Indian lessors, the Secretary's decision clearly was grounded in his fiduciary responsibility to the Indians. Whether or not the court agrees with the *effect* of the decision on the lessee is irrelevant. As long as there is a rational basis for the Secretary's conclusion that a bonus based on a renegotiation of the lease would improve the revenues flowing to the Indian lessor, his decision must be upheld. We are without authority to question or overturn that determination.

I am particularly concerned by the majority's suggestion that the Secretary must list and specifically explain his disposition of each and every factor which was considered in reaching a final decision. Nothing in the cases cited by the majority suggests that the decisionmaker must itemize each and every factor discarded as well as the factors taken into account in order to reach a reasoned decision.[3] All that those cases suggest is that the Secretary must (1) take into account and have before him factors which are relevant to the decision, and (2) provide enough of an explanation "to enable the court to determine whether the ... decision was reached for an impermissible reason or for no reason at all." *Dunlop v. Bachowski,* 421 U.S. 560, 573, 95 S.Ct. 1851, 1861, 44 L.Ed.2d 377 (1975); *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Here the Secretary clearly did that. First, under guidelines designed to conform to *Kenai,* the Secretary remanded to his subordinates for the precise purpose of ensur-

---

**3.** The fact is that *Kenai* can only fairly be read as requiring the Secretary to *consider* all relevant factors. There is no language in *Kenai* or anywhere else that requires the Secretary to specifically *articulate* in a written opinion the details of the factors he considered, so long as the record is clear that he had all the factors before him. Nothing could be more clear than the fact that his remand demonstrates that he had before him and considered all of the relevant factors.

The reasoning employed in cases involving Rule 52 of the Federal Rules of Civil Procedure is analogous here. For example, this court has held:

The rule does not require the making of elaborate findings of fact extending into minute

and unnecessary detail in respect to every feature or phase of the case.... The court did not dictate into the record findings of fact and conclusions of law. Neither did it file formal written findings of fact and conclusions of law. But the court did file a written opinion which contained findings of fact and conclusions of law. And while the opinion may not have been as complete as might have been desired in respect to the making of findings of fact, we think it is wholly unnecessary to remand the case for the making of additional findings.

*Trentman v. City and County of Denver,* 236 F.2d 951, 953 (10th Cir.), *cert. denied,* 352 U.S. 943, 77 S.Ct. 265, 1 L.Ed.2d 239 (1956).

ing that he had all of the relevant factors before him before he made his final decision. Second, as the court itself noted, in rendering his decision the Secretary stated that by disproving the communitization agreement with respect to the Rose lease, he was serving the best economic interests of the lessors. Maj. op. at 1525–26. I find no error in either the procedure followed, or the outcome achieved, by the Secretary. The Secretary may have been incorrect in his determination, but the correctness of his findings are *not* at issue here. The issue is whether or not the Secretary's opinion was arbitrary or capricious. All the majority has shown are rational reasons for disagreeing with the Secretary's determination, not that the Secretary's broad discretionary power was abused.

An even greater source of concern to me is the court's suggestion that if the Secretary can be faulted for failing to articulate his reasoning or follow his guidelines, then this court must declare, as a matter of law, a particular result. As stated previously, the most we can do under those circumstances is to remand for consideration of all relevant factors. *See Camp v. Pitts,* 411 U.S. at 142–43, 93 S.Ct. at 1244.

To summarize, in this case the Secretary had all of the relevant information before him. There is no suggestion that data were unavailable or withheld from the Secretary. There is no dispute that the Secretary's sole responsibility is to exercise his discretion as a trustee for the Indian lessors according to a reasoned assessment of the lessors' best interests—in this case the Rose lessors. *Kenai* itself makes clear that one of the things the Secretary has discretion to do is let leases expire if that will be in the best interest of the Indians. The Secretary did no more than that in this case. Finally, our role in reviewing this case is terribly limited by the deference we owe to the Secretary, and any shortcomings in the Secretary's decision may only be remedied by remand *to the Secretary* for appropriate action.

These considerations therefore dictate that we ought not overturn the Secretary's decision, and particularly we ought not mandate a particular result. For the foregoing reasons, I respectfully dissent, be-

lieving that the Secretary's decision should be affirmed.